# FRANKLIN v. LYNAUGH, DIRECTOR, TEXAS DEPARTMENT OF CORRECTIONS

No. 87–5546.   Argued March 1, 1988—Decided June 22, 1988

166

WHITE, J., announced the judgment of the Court, and delivered an opinion, in which REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, in which BLACKMUN, J., joined, *post*, p. 183. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 189.

*Mark Stevens* argued the cause for petitioner. With him on the briefs were *Clarence Williams, Allen Cazier,* and *George Scharmen.*

*William C. Zapalac,* Assistant Attorney General of Texas, argued the cause for respondent. With him on the brief were *Jim Mattox,* Attorney General, *Mary F. Keller,* First Assistant Attorney General, *Lou McCreary,* Executive Assistant Attorney General, and *Michael P. Hodge,* Assistant Attorney General.

JUSTICE WHITE announced the judgment of the Court, and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join.

In this case, we are called on to determine if the Eighth Amendment required a Texas trial court to give certain jury instructions, relating to the consideration of mitigating evidence, that petitioner had requested in the sentencing phase of his capital trial.

I

Around midnight on July 25, 1975, someone attacked Mary Margaret Moran, a nurse at a Veterans' Administration hospital in San Antonio, Texas, in the hospital parking lot as she left work. Five days later, Ms. Moran was found, naked, lying in a field in the midday Texas sun. She had been stabbed seven times; Ms. Moran was also robbed, and possibly sexually assaulted. Still alive when she was discovered, Ms. Moran was taken to a local hospital, where she died the following day.

Suspicion had focused on petitioner within hours of Ms. Moran's abduction, and he was arrested the following morning at his house, where police found a wide array of physical evidence concerning the crime.[1] Petitioner told the officers

---

[1] Among the items found at petitioner's home were: a pair of shoes with human blood on them that matched the victim's type; some of petitioner's clothes, soiled with blood and plant samples (matching the field where the victim was discovered); one of petitioner's shirts, covered with fibers that

that he had loaned his car and clothing to a friend the previous evening, and had no explanation for the physical evidence revealed by the search.

Petitioner did not take the stand at his trial.[2] His principal defense was that he had been mistakenly identified, and that — even if he was the person who stabbed the victim — her death was the result of incompetent hospital treatment and not the assault. The jury found petitioner guilty of capital murder under Tex. Penal Code Ann. § 19.03 (1974).

At the penalty phase of petitioner's trial, the State called four police officers who testified that petitioner had a bad reputation as a law-abiding citizen. The State also proved that petitioner had a prior conviction for rape, and called a witness who testified that petitioner had raped her the year before this crime was committed. The sole mitigating evidence petitioner presented was the stipulation that petitioner's disciplinary record while incarcerated from 1971–1974 and 1976–1980 was without incident. At the conclusion of this penalty hearing, the trial court, pursuant to Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon 1981), submitted two "Special Issues" to the jury,[3] instructing the jury that if

matched the victim's sweater. In addition, in a trash can behind petitioner's house, various items of the victim's personal property were found, as well as a knife which was later determined to be the apparent murder weapon.

Similar fiber, plant, and blood sample evidence was found in petitioner's car, matching samples of the victim's blood, her clothing, and the field where she was found. See *Franklin* v. *State*, 606 S. W. 2d 818, 819–821 (Tex. Crim. App. 1979).

[2] This petition concerns the proceedings at petitioner's 1982 trial, his third for this same offense. Petitioner's two previous convictions and death sentences were set aside for reasons unrelated to the issues before us now. See *Franklin* v. *State*, 693 S. W. 2d 420, 422 (Tex. Crim. App. 1985).

[3] The two Special Issues, as presented to the jury in this case, were:

"Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant, Donald Gene Franklin, that caused the death of

they determined the answer to both these questions to be "Yes," petitioner would be sentenced to death.

Earlier, petitioner had submitted five "special requested" jury instructions to direct the jury's consideration of the Special Issues.[4] In essence, the requested instructions would

---

Mary Margaret Moran, was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

"Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, Donald Gene Franklin, would commit criminal acts of violence that would constitute a continuing threat to society?" App. 15.

[4] The requested jury instructions were, in pertinent part, as follows:

"'You are instructed that any evidence which, in your opinion, mitigates against the imposition of the Death Penalty, including any aspect of the Defendant's character or record, and any of the circumstances of the commission of the offense . . . may be sufficient to cause you to have a reasonable doubt as to whether or not the true answer to any of the Special Issues is "Yes"; and in the event such evidence does cause you to have such a reasonable doubt, you should answer the Issue "No."'" Defendant's Special Requested Charge on Punishment No. One, App. 7.

"'An answer of "No" may be given to any of the [Special] Issues if:

.     .     .     .     .     .

"'2) . . . at least ten (10) jurors find that mitigating factors against the imposition of the Death Penalty exist, either in regard to any aspect of the Defendant's character or record, or in regard to any of the circumstances of the commission of the offense . . . or

"'3) if evidence of any such mitigating factors causes at least ten (10) jurors to have a reasonable doubt as to whether the true answer to the Issues is "Yes."'" Id., at 8–9 (No. Two). (Texas law instructs the jury to answer the Special Issues in the negative if 10 jurors agree on the "No" answer. See App. 13.).

"'You are instructed that you may answer any of the Special Issues "No" if you find any aspect of the Defendant's character or record or any of the circumstances of the offense as factors which mitigate against the imposition of the death penalty.'" Id., at 10 (No. Three).

"'You are instructed that you may answer Special Issue No. One "No" if you find any aspect of the Defendant's character or record as factors which mitigate against the imposition of the death penalty.'" Id., at 11 (No. Four).

"'You are instructed that you may answer Special Issue No. 2 "No" if you find any aspect of the Defendant's character or record or any of the

have told the jury that any evidence considered by them to mitigate against the death penalty should be taken into account in answering the Special Issues, and could *alone* be enough to return a negative answer to either one or both of the questions submitted to them—even if the jury otherwise believed that "Yes" answers to the Special Issues were warranted.

The trial court declined to give the petitioner's requested instructions, and instead gave a brief charge which remonstrated the jury to "remember all the instructions that the Court has previously given you and be guided by them." App. 13. Those previous instructions included the charge that they arrive at their verdict based on all the evidence. The jury returned "Yes" answers to both Special Issues and the trial court therefore imposed a sentence of death. Subsequently, the Texas courts affirmed petitioner's conviction and death sentence. *Franklin* v. *State*, 693 S. W. 2d 420 (Tex. Crim. App. 1985).

Petitioner then filed this federal habeas action contesting his conviction and sentence. Among other claims, petitioner argued that, absent his special requested instructions, the Texas Special Issues limited the jury's consideration of mitigating evidence, contrary to this Court's decision in *Lockett* v. *Ohio*, 438 U. S. 586 (1978), and several other decisions as well. The District Court rejected this claim, finding no error in the trial court's refusal to give the requested instructions and no violation of this Court's precedents. App. 22. The Court of Appeals affirmed the District Court's denial of habeas relief without commenting on the jury instruction claim. 823 F. 2d 98, 99–100 (CA5 1987).

Petitioner then sought review by this Court. We granted certiorari to determine if the trial court's refusal to give the requested instructions violated petitioner's Eighth Amend-

---

circumstances of the offense as factors which mitigate against the imposition of the death penalty.'" *Id.*, at 12 (No. Five).

ment right to present mitigating evidence at his capital sentencing trial, 484 U. S. 891 (1987), and now affirm the judgment below.

## II

*Jurek* v. *Texas*, 428 U. S. 262 (1976), expressly upheld the constitutionality of the manner in which mitigating evidence is considered under the "Special Issues" submitted to Texas capital juries. See *id.*, at 273 (opinion of Stewart, Powell, and STEVENS, JJ.). Petitioner here does not challenge the constitutionality of the Texas capital sentencing scheme as a general matter, see Tr. of Oral Arg. 11; petitioner has disavowed any request for this Court to overrule its decision in *Jurek*, see Tr. of Oral Arg. 18, 20.

Nor does petitioner complain that he was denied the opportunity to present any mitigating evidence to the jury, or that the jury was instructed to ignore any mitigating evidence petitioner did present. Cf. *Hitchcock* v. *Dugger*, 481 U. S. 393 (1987). Here, petitioner was permitted to present to the jury any and all mitigating evidence that he offered. It is the established Texas practice to permit jury consideration of "'whatever mitigating circumstances' the defendant might be able to show" in capital sentencing—a practice which this Court relied upon when it concluded in *Lockett* v. *Ohio*, *supra*, that our decision in that case did not require reversal of our earlier approval of the Texas Special Issue scheme in *Jurek*. See *Lockett* v. *Ohio*, *supra*, at 606–607 (opinion of Burger, C. J.). In the decade which has followed, the Texas courts have expressed resolute adherence to *Lockett*, declaring that under Texas' capital sentencing procedures the defense is free to ask "the jury . . . to consider whatever evidence of mitigating circumstances the defense can bring before it." *Quinones* v. *State*, 592 S. W. 2d 933, 947 (Tex. Crim. App. 1980).[5]

---

[5] See also, *e. g.*, *Cordova* v. *State*, 733 S. W. 2d 175, 189–190, and n. 3 (Tex. Crim. App. 1987); *Johnson* v. *State*, 691 S. W. 2d 619, 625–626 (Tex.

Petitioner nevertheless complains that the instructions and Special Issues did not provide sufficient opportunity for the jury, in the process of answering the two Special Issues, to consider whatever "residual doubt" it may have had about petitioner's guilt. The instructions also allegedly did not allow the jury to give adequate weight to the mitigating evidence of petitioner's good behavior while in prison. In addition, petitioner contends that the Eighth Amendment was violated because the jury was not afforded an opportunity to "giv[e] independent mitigating weight," *Lockett, supra,* at 605, to the circumstances the defense presented; *i. e.,* not permitted to weigh petitioner's mitigating evidence and circumstances apart from its deliberation over the Texas Special Issues, and return a verdict requiring a life sentence. See Brief for Petitioner 20; Tr. of Oral Arg. 18, 23.

We consider these claims with respect to each of petitioner's two "mitigating factors."

### A

Petitioner first suggests that the jury may, in its penalty deliberations, have harbored "residual doubts" about three issues considered in the guilt phase of his trial: first, petitioner's identity as the murderer; second, the extent to which petitioner's actions (as opposed to medical mistreatment) actually caused the victim's death; and third, the extent to which petitioner's actions were intended to result in the victim's death. See Brief for Petitioner 13; 12 Record 2892–2896. He argues that the jury should have been instructed that it could consider any such doubts in arriving at its answers to the Special Issues.

### (1)

At the outset, we note that this Court has never held that a capital defendant has a constitutional right to an instruction telling the jury to revisit the question of his identity as the

Crim. App. 1984); *Stewart* v. *State,* 686 S. W. 2d 118, 121 (Tex. Crim. App. 1984); *Williams* v. *State,* 674 S. W. 2d 315, 322 (Tex. Crim. App. 1984).

murderer as a basis for mitigation. Petitioner suggests that our discussion of the "residual doubt" question in *Lockhart* v. *McCree*, 476 U. S. 162, 180–182 (1986), supports his position that he has such an entitlement. See Tr. of Oral Arg. 6–7; Brief for Petitioner 9. But all that this aspect of the *Lockhart* opinion stands for is the simple truism that *where* "States are willing to go to allow defendants to capitalize on 'residual doubts,'" such doubts will inure to the defendant's benefit. *Lockhart, supra,* at 181. *Lockhart* did not endorse capital sentencing schemes which permit such use of "residual doubts," let alone suggest that capital defendants have a *right* to demand jury consideration of "residual doubts" in the sentencing phase. Indeed, the *Lockhart* dissent recognized that there have been only a "few times in which any legitimacy has been given" to the notion that a convicted capital defendant has a right to argue his innocence during the sentencing phase. 476 U. S., at 205–206 (MARSHALL, J., dissenting). The dissent also noted that this Court has not struck down the practice in some States of prohibiting the consideration of "residual doubts" during the punishment trial.[6] *Ibid.*

---

[6] Finding a constitutional right to rely on a guilt-phase jury's "residual doubts" about innocence when the defense presents its mitigating case in the penalty phase is arguably inconsistent with the common practice of allowing penalty-only trials on remand of cases where a death sentence— but not the underlying conviction—is struck down on appeal. See, *e. g.,* *Scott* v. *State,* 310 Md. 277, 301, 529 A. 2d 340, 352 (1987); *Stringer* v. *State,* 500 So. 2d 928, 946 (Miss. 1986); *Whalen* v. *State,* 492 A. 2d 552, 569 (Del. 1985). Cf. *Lockhart* v. *McCree,* 476 U. S., at 205 (MARSHALL, J., dissenting).

In fact, this Court has, on several previous occasions, suggested such a method of proceeding on remand. See, *e. g.,* *Hitchcock* v. *Dugger,* 481 U. S. 393, 399 (1987). Moreover, petitioner himself, in suggesting the appropriate relief in this case, asked only that he be "resentenced in a proceeding that comports with the requirements of *Lockett*"—not that he be retried in full so as to have the benefit of any potential guilt-phase "residual doubts." See Brief for Petitioner 21.

In sum, we are quite doubtful that such "penalty-only" trials are violative of a defendant's Eighth Amendment rights. Yet such is the logical

Our edict that, in a capital case, "'the sentencer . . . [may] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense,'" *Eddings* v. *Oklahoma,* 455 U. S. 104, 110 (1982) (quoting *Lockett,* 438 U. S., at 604), in no way mandates reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's "character," "record," or a "circumstance of the offense." This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.

Most importantly, even if we were inclined to discern such a right in the Eighth Amendment, we would not find any violation of it *in this case.* For even if such a right existed, nothing done by the trial court impaired petitioner's exercise of this "right." The trial court placed no limitation whatsoever on petitioner's opportunity to press the "residual doubts" question with the sentencing jury. Moreover, in our view, the trial court's rejection of petitioner's proffered jury instructions was without impact on the jury's consideration of the "residual doubts" issue. We reject petitioner's complaint that the possibility of residual doubt was not "self-evidently relevant to either of the special issue questions," and that "[u]nless told that *residual* doubt . . . could be considered in relation to [the special issue] question[s], the jurors could logically have concluded that such doubt was irrelevant." Brief for Petitioner 15, 16. Among other problems with this argument is the simple fact that petitioner's requested instructions on mitigating evidence themselves offered *no* specific direction to the jury concerning the potential consideration of "residual doubt." See App. 7–12. The proposed instructions did not suggest that lingering doubts

conclusion of petitioner's claim of a constitutional right to argue "residual doubts" to a capital sentencing jury.

about the petitioner's guilt were to be a subject of deliberations in the sentencing phase.[7]   Consequently, it is difficult to see how the rejection of these instructions denied petitioner the benefit of any "residual doubts" about his guilt.

In sum, even if petitioner had some constitutional right to seek jury consideration of "residual doubts" about his guilt during his sentencing hearing—a questionable proposition—the rejection of petitioner's proffered jury instructions did not impair this "right."

(2)

In regard to the second and third elements of "residual doubt" petitioner advances—potential jury doubts over his responsibility for the victim's death, and the extent to which he intended the victim's death if indeed he was her attacker—we do not think that the Texas Special Issues limited the jury's consideration of any doubts in these respects.

Petitioner suggests that there may have been residual doubt over the question of whether the victim would have perished had she received proper medical treatment.   See Brief for Petitioner 5, 13; 12 Record 2895–2896.   Yet, to the extent that this question implicates petitioner's culpability in causing Ms. Moran's death, this is precisely the concern that the jury might have considered in answering Special Issue No. One, *i. e.*, in determining that "the conduct of the Defendant . . . that caused the death of [the victim] was committed deliberately and with the reasonable expectation that the death of the deceased . . . would result."   App. 15.   The

---

[7] Likewise, petitioner's closing argument—the sole element of his presentation in the sentencing phase—did not draw the jury's attention to the "residual guilt" question.   The only element of the defense's lengthy closing statement that even remotely raised this issue was a brief suggestion, in the course of a general argument against the death penalty, that the jury should recognize "our inherent human fallibility . . . recognize [that] we can make a mistake."   See 13 Record 2968.   Otherwise, nothing in the defense's mitigating presentation sought the jury's·reconsideration of petitioner's guilt in committing this crime.

Texas courts have consistently held that something more must be found in the penalty phase—something beyond the guilt-phase finding of "intentional" commission of the crime— before the jury can determine that a capital murder is "deliberate" within the meaning of the first Special Issue. See, e. g., Marquez v. State, 725 S. W. 2d 217, 244 (Tex. Crim. App. 1987); Fearance v. State, 620 S. W. 2d 577, 584 (Tex. Crim. App. 1981). In fact, Texas juries have found, on occasion, that a defendant had committed an "intentional murder" without finding that the murder was a "deliberate" one. See, e. g., Heckert v. State, 612 S. W. 2d 549, 552 (Tex. Crim. App. 1981). Petitioner was not deprived of any opportunity to make a similar argument here in mitigation.

The same is true of the parallel contention that petitioner did advance at the end of the penalty hearing: that his murder of Ms. Moran was not a "deliberate" one, but rather, "a [h]elter-skelter crazy crime of passion." 13 Record 2962–2963. This argument echoed a theme petitioner raised in the closing argument of the guilt phase of the trial. See 12 Record 2893–2897. But this element of "residual doubt" could likewise have been considered by the jury in answering the first Special Issue.

Petitioner was thus not deprived of any chance to have his sentencing jury weigh this element of his culpability. And, as was the case with respect to the "residual doubt" issue discussed in Part II–A(1), there was nothing in petitioner's proposed jury instructions which would have provided the jury with any further guidance, beyond that already found in the first Special Issue, to direct its consideration of this mitigating factor. The denial of petitioner's special requested instructions in no way limited his efforts to gain full consideration by the sentencing jury—including a reconsideration of any "residual doubts" from the guilt phase— of petitioner's deliberateness in killing Ms. Moran.

## B

The second mitigating circumstance which petitioner claims that the jury did not adequately consider is his good disciplinary record during his period of incarceration, both before and after the murder of Ms. Moran.

As noted above, petitioner's prison disciplinary record was presented to the jury in this case—in fact, it was the sole bit of evidence in mitigation petitioner presented during the penalty phase of his trial. 13 Record 2952–2953. This case is therefore unlike *Skipper* v. *South Carolina*, 476 U. S. 1, 3 (1986), where evidence of the defendant's conduct while incarcerated was wholly excluded from the jury's consideration in its sentencing deliberations. To the contrary, petitioner here was permitted to press, with some emphasis, his good behavior in prison when he urged the jury, at the close of the sentencing hearing, to return a ".No" answer to the second Special Issue concerning future dangerousness. See 13 Record 2963–2965. Petitioner acknowledged as much before this Court. Tr. of Oral Arg. 14, 24.

Petitioner objects, however, that—absent his requested jury instructions—there was no opportunity for the jury to give "independent" mitigating weight to his prison record. See *Lockett*, 438 U. S., at 604. He argues that this mitigating evidence had significance independent of its relevance to the Special Issues—as a reflection on his "character." See *Skipper, supra,* at 4. Petitioner contends that his prison disciplinary record reflected so positively on his "character" that the instructions in this case should have provided the jury with a "mechanism though which to impose a life sentence" even if the jury otherwise believed that both Special Issues should have been answered "Yes." Brief for Petitioner 20. For several reasons, we do not find these arguments convincing.

First, petitioner was accorded a full opportunity to have his sentencing jury consider and give effect to any mitigating

impulse that petitioner's prison record might have suggested to the jury as they proceeded with their task. In resolving the second Texas Special Issue the jury was surely free to weigh and evaluate petitioner's disciplinary record as it bore on his "character"—that is, his "character" as measured by his likely future behavior. We have never defined what the term "character" means when we have held that a defendant's "character" is a relevant consideration in capital sentencing.[8] But nothing in our cases supports petitioner's contention that relevant aspects of his "character," as far as they were illuminated by the presentation of evidence concerning petitioner's disciplinary record, encompassed anything more than those matters fully considered by the jury when it was asked to answer the second Special Issue.

Indeed, our discussion in *Skipper* of the relevancy of such disciplinary record evidence in capital sentencing decisions dealt exclusively with the question of how such evidence reflects on a defendant's likely future behavior. See *Skipper, supra,* at 4–5. Nothing in *Skipper* suggests that such evidence has any further relevancy with respect to a defendant's "character" or with respect to the punishment decision. Moreover, *Skipper*'s discussion of the proper use of a defendant's prison disciplinary record in a jury's sentencing decision focused precisely on the way in which such evidence is encompassed by the Texas future-dangerousness question, and on the Court's previous decision in *Jurek.* See 476 U. S., at 4–5. Furthermore, we note that nothing in petitioner's presentation or discussion of his prison record at the sentencing hearing urged the jury to consider petitioner's record as probative of anything more than that the answer to the question posed by Special Issue Two should be "No." See 13 Record

---

[8] See, *e. g., Skipper* v. *South Carolina,* 476 U. S. 1, 4 (1986); *Eddings* v. *Oklahoma,* 455 U. S. 104, 110 (1982); *Lockett* v. *Ohio,* 438 U. S. 586, 604 (1978) (plurality opinion); *Woodson* v. *North Carolina,* 428 U. S. 280, 304 (1976).

2963–2964. Even in this Court, in seeking to define how his prison record sheds light on his "character," petitioner has cast his argument in terms of future dangerousness.[9]

We find unavailing petitioner's reliance on this Court's statement in *Eddings*, 455 U. S., at 114, that the sentencing jury may not be precluded from considering "any relevant, mitigating evidence." See Tr. of Oral Arg. 15. This statement leaves unanswered the question: relevant to what? While *Lockett, supra,* at 604, answers this question at least in part—making it clear that a State cannot take out of the realm of relevant sentencing considerations the questions of the defendant's "character," "record," or the "circumstances of the offense"—*Lockett* does not hold that the State has no role in structuring or giving shape to the jury's consideration of these mitigating factors. See *Booth* v. *Maryland*, 482 U. S. 496, 502 (1987). Given the awesome power that a sentencing jury must exercise in a capital case, it may be advisable for a State to provide the jury with some framework for discharging these responsibilities. And we have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required. See *Zant* v. *Stephens*, 462 U. S. 862, 875–876, n. 13 (1983).

We are thus quite sure that the jury's consideration of petitioner's prison record was not improperly limited. The jury

---

[9] In describing what, arguably, the Texas Special Issue did *not* permit the jury to take into account with respect to petitioner's "character" and his disciplinary record, petitioner principally argues that "Mr. Franklin's behavior in prison demonstrated that he had the strength of character to live a peaceful, productive life within the structured environment of a prison, and that, so long as he stayed in prison *there was no probability that he would pose a threat to others.*" Brief for Petitioner 18–19 (emphasis added).

Yet, as the State noted at argument, the question of a defendant's likelihood of injuring others in prison is precisely the question posed by the second Texas Special Issue. See Tr. of Oral Arg. 27–28.

was completely free to give that evidence appropriate weight in arriving at its answers to the Special Issues. And as for the claim that the jury should have been instructed that, even if its answer to the Special Issues was "Yes," it was still entitled to cast an "independent" vote against the death penalty, we note that this submission is foreclosed by *Jurek*, which held that Texas could constitutionally impose the death penalty if a jury returned "Yes" answers to the two Special Issues. See *Jurek*, 428 U. S., at 273–274 (joint opinion). *Jurek* has not been overruled; and we are not inclined to take any such action now.[10]

---

[10] The dissent says that the Texas scheme is infirm because it "limits the sentencer's consideration to only that mitigating evidence that bears on one or more of the Special Issues." *Post*, at 199. It is difficult to reconcile this statement with the dissent's avowed adherence to *Jurek*. If, as *Jurek* held, it is constitutional for Texas to impose a death sentence on a person whenever a jury answers both Special Issues in the affirmative—without any other inquiry—then surely Texas must be permitted to direct the jury's consideration of mitigating evidence to those items relevant to this undertaking.

In the final analysis, the dissent's position appears to be that the Texas capital punishment statute is unconstitutional because it does not require that the jurors be instructed that—even though they would answer the two statutory questions "Yes" after taking account of all mitigating evidence—they may rely on any mitigating evidence before them, although irrelevant to those two questions, as an independent basis for deciding against the death penalty. *Post*, at 199–200. Yet this is nothing more or less than a requirement that three, rather than two, Special Issues be put to the jury, the third one being: "Does any mitigating evidence before you, whether or not relevant to the above two questions, lead you to believe that the death penalty should not be imposed?"

Such a requirement would have foreclosed the decision in *Jurek*, since the Texas statute upheld there did not mandate such an inquiry—one that would be required in virtually every case where there was any suggestion of a mitigating circumstance, under the dissent's view. As we have said above, however, our cases since *Jurek* have not suggested that *Jurek* is to be overruled or modified. Our differences with the dissent are therefore clear enough: notwithstanding its stated adherence to *Jurek*, the dissent would revisit and overrule that precedent; we decline to do so.

## III

Our specific rejection of petitioner's claims is well supported by the general principles governing the role of mitigating evidence in capital sentencing which have been developed since our decisions in *Gregg* v. *Georgia*, 428 U. S. 153 (1976), and *Jurek* v. *Texas, supra.*

It is true that since *Jurek* was decided, this Court has gone far in establishing a constitutional entitlement of capital defendants to appeal for leniency in the exercise of juries' sentencing discretion. See, *e. g., Eddings* v. *Oklahoma, supra,* at 113–117; *Lockett* v. *Ohio,* 438 U. S., at 608 (opinion of Burger, C. J.). But even in so doing, this Court has never held that jury discretion must be unlimited or unguided; we have never suggested that jury consideration of mitigating evidence must be undirected or unfocused; we have never concluded that States cannot channel jury discretion in capital sentencing in an effort to achieve a more rational and equitable administration of the death penalty.

Much in our cases suggests just the opposite. This Court has previously held that the States "must channel the [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey* v. *Georgia,* 446 U. S. 420, 428 (1980) (plurality opinion) (footnotes omitted). Our cases before and since have similarly suggested that "sentencers may not be given unbridled discretion in determining the fates of those charged with capital offenses" and that the "Constitution . . . requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion." *California* v. *Brown,* 479 U. S. 538, 541 (1987). See also *Proffitt* v. *Florida,* 428 U. S. 242, 253 (1976) (joint opinion); *Gregg* v. *Georgia, supra,* at 189, 195, n. 46, 196, n. 47, 198 (joint opinion).

Arguably these two lines of cases—*Eddings* and *Lockett* on the one hand, and *Gregg* and *Proffitt* on the other—are somewhat in "tension" with each other. See *California* v. *Brown, supra*, at 544 (O'CONNOR, J., concurring). Yet the Texas capital sentencing system has been upheld by this Court, and its method for providing for the consideration of mitigating evidence has been cited repeatedly with favor,[11] precisely because of the way in which the Texas scheme accommodates *both* of these concerns. Doubtlessly this is why this Court originally approved Texas' use of Special Issues to guide jury discretion in the sentencing phase, notwithstanding the fact—expressly averted to in the plurality opinion for the Court—that mitigating evidence is employed in the Texas scheme only to inform the jury's consideration of the answers to the Special Issue questions. *Jurek, supra*, at 272–273.[12] No doubt this is also why the Texas scheme has continued to pass constitutional muster, even when the Court laid down its broad rule in *Lockett, supra*, at 606–607 (opinion of Burger, C. J.), concerning the consideration of mitigating evidence. Simply put, we have previously recognized that the Texas Special Issues adequately "allo[w] the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provid[e] for jury discretion." See *Lowenfield* v. *Phelps*, 484 U. S. 231, 245 (1988). We adhere to this prior conclusion.

---

[11] See, *e. g., Lowenfield* v. *Phelps*, 484 U. S. 231, 245–246 (1988); *Lockhart* v. *McCree*, 476 U. S., at 193; *Pulley* v. *Harris*, 465 U. S. 37, 48–49 (1984); *Zant* v. *Stephens*, 462 U. S. 862, 875–876, n. 13 (1983); *Adams* v. *Texas*, 448 U. S. 38, 46 (1980).

[12] We also repeat our previous acknowledgment, that—as a practical matter—a Texas capital jury deliberating over the Special Issues is aware of the consequences of its answers, and is likely to weigh mitigating evidence as it formulates these answers in a manner similar to that employed by capital juries in "pure balancing" States. See *Adams* v. *Texas, supra*, at 46. Thus, the differences between the two systems may be even less than it appears at first examination.

## IV

Because we do not believe that the jury instructions or the Texas Special Issues precluded jury consideration of any relevant mitigating circumstances in this case, or otherwise unconstitutionally limited the jury's discretion here, we reject petitioner's Eighth Amendment challenge to his death sentence. Consequently, the Fifth Circuit's judgment in this case is

*Affirmed.*

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN joins, concurring in the judgment.

Petitioner was sentenced to death by a jury that was permitted to express its views on punishment only by answering two questions: (1) Did petitioner murder the victim deliberately? and (2) Is there a probability that he will pose a continuing threat to society? We must decide whether this capital sentencing scheme unconstitutionally limited the jury's ability to give mitigating effect to evidence of petitioner's prison record or to "residual doubts" about his guilt.

The plurality concludes that the jury's consideration of petitioner's prison record and of its "residual doubts" about his guilt was not limited in this case, but nevertheless goes on to suggest that a State may constitutionally limit the ability of the sentencing authority to give effect to mitigating evidence relevant to a defendant's character or background or to the circumstances of the offense that mitigates against the death penalty. *Ante*, at 179, 180, n. 10. Unlike the plurality, I have doubts about a scheme that is limited in such a fashion. I write separately to express those doubts and to explain my reasons for concurring in the judgment.

In *Jurek* v. *Texas*, 428 U. S. 262 (1976), this Court held that the Texas capital sentencing procedures satisfied the Eighth Amendment requirement that the sentencer be allowed to consider circumstances mitigating against capital punishment. It was observed that even though the stat-

ute did not explicitly mention mitigating circumstances, the Texas Court of Criminal Appeals had construed the special verdict question regarding the defendant's future dangerousness to permit jury consideration of the defendant's prior criminal record, age, mental state, and the circumstances of the crime in mitigation. *Id.*, at 271–273. Since the decision in *Jurek*, we have emphasized that the Constitution guarantees a defendant facing a possible death sentence not only the right to introduce evidence mitigating against the death penalty but also the right to consideration of that evidence by the sentencing authority. *Lockett* v. *Ohio*, 438 U. S. 586 (1978), established that a State may not prevent the capital sentencing authority "from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Id.*, at 605 (plurality opinion). We reaffirmed this conclusion in *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), and in *Hitchcock* v. *Dugger*, 481 U. S. 393 (1987).

In my view, the principle underlying *Lockett*, *Eddings*, and *Hitchcock* is that punishment should be directly related to the personal culpability of the criminal defendant.

> "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. . . . Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime." *California* v. *Brown*, 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring) (emphasis in original).

In light of this principle it is clear that a State may not constitutionally prevent the sentencing body from giving effect to evidence relevant to the defendant's background or character or the circumstances of the offense that mitigates against

the death penalty. Indeed, the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration.

Under the sentencing procedure followed in this case the jury could express its views about the appropriate punishment only by answering the special verdict questions regarding the deliberateness of the murder and the defendant's future dangerousness. To the extent that the mitigating evidence introduced by petitioner was relevant to one of the special verdict questions, the jury was free to give effect to that evidence by returning a negative answer to that question. If, however, petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its "reasoned moral response" to that evidence. If this were such a case, then we would have to decide whether the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation. In my view, however, this is not such a case. The only mitigating evidence introduced by petitioner was the stipulation that he had no record of disciplinary violations while in prison. It is undisputed that the jury was free to give mitigating effect to this evidence in answering the special verdict question regarding future dangerousness. While it is true that the jury was prevented from giving mitigating effect to the stipulation to the extent that it demonstrated positive character traits other than the ability to exist in prison without endangering jailers or fellow inmates, that limitation has no practical or constitutional significance in my view because the stipulation had no relevance to any other aspect of petitioner's character. Nothing in *Lockett* or *Eddings* requires that the sentencing authority be permitted to give effect to evidence

beyond the extent to which it is relevant to the defendant's character or background or the circumstances of the offense. *Lockett, supra,* at 604, n. 12 ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense"); *Eddings, supra,* at 114 (holding that the sentencer must consider "any *relevant* mitigating evidence") (emphasis added).

The limited probative value of the stipulation regarding petitioner's lack of prison disciplinary violations is best illustrated by the contrasting examples of probative character evidence suggested by the dissent. See *post,* at 190. Evidence of voluntary service, kindness to others, or of religious devotion might demonstrate positive character traits that might mitigate against the death penalty. Although petitioner argued to the sentencing jury that his prison record demonstrated his lack of future dangerousness, petitioner did not suggest that his lack of disciplinary violations revealed anything more positive about his character than that. See 13 Record 2963–2965. This is not surprising, because the lack of a prison disciplinary record reveals nothing about a defendant's character except that the defendant can exist in the highly structured environment of a prison without endangering others.

The conclusion that petitioner was not prejudiced by the limitation placed on the jury's consideration of the mitigating evidence he introduced is entirely consistent with our decision in *Skipper* v. *South Carolina,* 476 U. S. 1 (1986). In *Skipper* we vacated a death sentence because "it appear[ed] reasonably likely that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence." *Id.,* at 8. In the case before us, the State did not interfere with petitioner's presentation of evidence regarding his lack of future dangerousness or with the jury's ability to give effect to that evi-

dence. Unlike the defendant in *Skipper*, petitioner suffered no prejudice from the limitations placed on the jury's ability to consider and give effect to mitigating evidence regarding his character.

Petitioner also contends that the sentencing procedures followed in his case prevented the jury from considering, in mitigation of sentence, any "residual doubts" it might have had about his guilt. Petitioner uses the phrase "residual doubts" to refer to doubts that may have lingered in the minds of jurors who were convinced of his guilt beyond a reasonable doubt, but who were not absolutely certain of his guilt. Brief for Petitioner 14. The plurality and dissent reject petitioner's "residual doubt" claim because they conclude that the special verdict questions did not prevent the jury from giving mitigating effect to its "residual doubt[s]" about petitioner's guilt. See *ante*, at 175; *post*, at 189. This conclusion is open to question, however. Although the jury was permitted to consider evidence presented at the guilt phase in the course of answering the special verdict questions, the jury was specifically instructed to decide whether the evidence supported affirmative answers to the special questions "beyond a *reasonable* doubt." App. 15 (emphasis added). Because of this instruction, the jury might not have thought that in sentencing petitioner, it was free to demand proof of his guilt beyond *all* doubt.

In my view, petitioner's "residual doubt" claim fails, not because the Texas scheme allowed for consideration of "residual doubt" by the sentencing body, but rather because the Eighth Amendment does not require it. Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. We have recognized that some States have adopted capital sentencing procedures that permit defendants in some cases to enjoy the benefit of doubts that linger from the guilt phase of the trial,

see *Lockhart* v. *McCree*, 476 U. S. 162, 181 (1986), but we have never indicated that the Eighth Amendment requires States to adopt such procedures. To the contrary, as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of "residual doubts" about guilt. See *ante*, at 173, n. 6.

Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because "residual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. See *California* v. *Brown*, 479 U. S., at 541; *id.*, at 544 (O'CONNOR, J., concurring); *Eddings*, 455 U. S., at 110, 112; *id.*, at 117 (O'CONNOR, J., concurring); *Lockett*, 438 U. S., at 605. "Residual doubt" is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty." Petitioner's "residual doubt" claim is that the States must permit capital sentencing bodies to demand proof of guilt to "an absolute certainty" before imposing the death sentence. Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing.

In sum I agree with the plurality's conclusion that, on the facts of this case, the Texas capital sentencing procedure did not prevent the sentencing jury from giving mitigating effect to any evidence relevant to petitioner's character or background or to the circumstances of the offense. Moreover, while the capital sentencing procedure may have prevented the jury from giving effect to any "residual doubts" it might have had about petitioner's guilt, this aspect of Texas procedure violated no Eighth Amendment guarantee. For these reasons, I concur in the judgment.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The plurality's opinion discusses three subjects. In Part II–A the plurality explains why in this case there was no interference with any right petitioner may have had under the Eighth Amendment to have the jury consider "residual doubt" in making its sentencing determination. I do not disagree with that conclusion. In Part II–B the plurality concludes that evidence concerning petitioner's good behavior in prison is relevant to the sentencing determination only insofar as it may shed light on his future behavior. I disagree with that conclusion. Finally, in the last paragraph of Part II–B and in Part III, the plurality makes general comments on the Texas capital sentencing scheme. I shall begin with a discussion of the relevance of petitioner's mitigating evidence and an explanation of why, under the Texas sentencing scheme, the failure to give instructions similar to those requested by petitioner prevented the jury from giving that evidence independent mitigating weight. I will then comment on the portion of the plurality's opinion that seems to imply that it is permissible to "channel jury discretion in capital sentencing" by foreclosing the jury's consideration of relevant mitigating evidence.

I

In this case the mitigating evidence submitted by petitioner consisted of a stipulation indicating that during two periods of imprisonment aggregating about seven years he committed no disciplinary violations. That evidence militated against imposition of the death sentence in two quite different ways. Looking to the past, it suggested the possibility that petitioner's character was not without some redeeming features; a human being who can conform to strict prison rules without incident for several years may have virtues that can fairly be balanced against society's interest in killing him in retribution for his violent crime. Looking to the future, that evidence suggested that a sentence to prison,

rather than to death, would adequately protect society from future acts of violence by petitioner. The evidence was admissible for both purposes.

In *Skipper* v. *South Carolina*, 476 U. S. 1 (1986), the State argued that evidence of good behavior in prison could be excluded when offered to show the defendant's *"future* adaptability to prison life" *id.*, at 6 (emphasis in original), even though it could properly be admitted to prove "past good conduct in jail for purposes of establishing his good character." *Ibid.* We rejected that distinction as a basis for excluding this type of evidence. Implicitly the Court held that the evidence must be admitted not only for its relevance to the defendant's character and past history but also for its relevance to a prediction about his future behavior.

Ironically, today the plurality turns the Court's decision in *Skipper* on end. The plurality holds that no special instruction was needed to allow the jury to give adequate weight to the evidence of petitioner's good conduct in prison because that evidence had no relevance except insofar as it shed light on petitioner's probable future conduct. The plurality is quite wrong. Past conduct often provides insights into a person's character that will evoke a merciful response to a demand for the ultimate punishment even though it may shed no light on what may happen in the future. Evidence of past good behavior in prison is relevant in this respect just as is evidence of honorable military service or kindness to those in the defendant's community or regular church attendance. Although it may aid the sentencer in predicting the defendant's future conduct, it also tells the sentencer something about the defendant's personality. Importantly, for example, it may suggest that the conduct of which the defendant stands convicted was not in keeping with his or her usual qualities or traits, a fact that has as much relevance to culpability as to future dangerousness. Further, the evidence of, petitioner's past prison conduct was relevant to show the appropriateness of the alternative punishment of imprison-

ment *for him,* another reflection of his character. Thus evidence of petitioner's conduct in prison "encompassed . . . more than [just] those matters . . . considered by the jury when it was asked to answer the second Special Issue," *ante,* at 178, which asked only if there was a probability that petitioner would commit future criminal acts of violence.

"The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson* v. *Mississippi,* 486 U. S. 578, 584 (1988). For that reason, when it is "considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it." *Jurek* v. *Texas,* 428 U. S. 262, 273 (1976) (joint opinion). If mitigating evidence is relevant to the sentencing determination, a defendant has a right to have the jury consider it even if an appellate court may question its weight.

Our cases explicating the role of mitigating evidence in capital sentencing have rigorously enforced one simple rule: A sentencing jury must be given the authority to reject imposition of the death penalty on the basis of any evidence relevant to the defendant's character or record or the circumstances of the offense proffered by the defendant in support of a sentence less than death. That rule does not merely require that the jury be allowed to hear any such evidence the defendant desires to introduce, *Skipper* v. *South Carolina,* 476 U. S., at 4; *Hitchcock* v. *Dugger,* 481 U. S. 393, 394 (1987), it also requires that the jury be allowed to give "independent mitigating weight" to the evidence. *Lockett* v. *Ohio,* 438 U. S. 586, 605 (1978);[1] *Eddings* v. *Oklahoma,* 455

---

[1] Although only four Members of the Court endorsed the entire opinion written by Chief Justice Burger in *Lockett,* it has the same precedential value as a Court opinion because JUSTICE MARSHALL's vote to set aside the death penalty rested on a broader ground than did the plurality's. See

U. S. 104, 112–113 (1982). We therefore consistently have condemned the erection of barriers to the jury's full consideration of mitigating evidence without regard to the device by which the barrier was created. *Mills* v. *Maryland*, 486 U. S. 367, 375 (1988); see *Lockett* v. *Ohio*, 438 U. S., at 586 (statute); *Hitchcock* v. *Dugger*, 481 U. S., at 398–399 (same); by the sentencing court, *Eddings* v. *Oklahoma*, 455 U. S., at 104 (sentencing court decision); *Skipper* v. *South Carolina*, 476 U. S., at 1 (evidentiary ruling).

On its face, the Texas capital sentencing scheme makes no mention of mitigating evidence. *Jurek*, 428 U. S., at 272. Instead it merely asks the jury to give a "yes" or "no" answer to two, and in some instances three, "Special Issues." Here the jury was instructed to answer "yes" to the first Special Issue if it found that petitioner acted "deliberately" and "with the reasonable expectation that [her] death . . . would result" when he assaulted Ms. Moran and "yes" to the second Special Issue if it found a probability that petitioner "would commit criminal acts of violence that would constitute a continuing threat to society." See, *ante*, at 168–169, and n. 3. Although the jury was informed that if it answered both issues "yes" petitioner would be sentenced to death, neither of the Special Issues as they would have been understood by reasonable jurors gave the jury the opportunity to consider petitioner's mitigating evidence of past good conduct in prison to the extent that it encompassed matters beyond those relevant to answering the Special Issues. Petitioner therefore was at least entitled to an instruction informing the jury that it could answer one of the issues "no" if it found by that evidence that petitioner's character was such that he should not be subjected to the ultimate penalty. The failure to give such an instruction removed that evidence from the sen-

*Marks* v. *United States*, 430 U. S. 188, 193 (1977) (when no single rationale supporting the result commands a majority of the Court, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds").

tencer's consideration just as effectively as would have an instruction informing the jury that petitioner's character was irrelevant to its sentencing decision.

The plurality errs in suggesting that under our precedents Texas may "structur[e]" or "giv[e] shape", *ante*, at 179, to the jury's consideration of character as a mitigating factor by defining character to include only that evidence that reflects on future dangerousness, *ante*, at 177–178. The notion that a State may permissibly provide such a "framework" for the sentencer's discharge of its "awesome power," *ante*, at 179, is inconsistent with our holdings in *Lockett* and *Hitchcock* that a State may not limit the sentencer's consideration to certain enumerated mitigating factors. There is no constitutionally meaningful distinction between allowing the jury to hear all the evidence the defendant would like to introduce and then telling the jury to consider that evidence only to the extent that it is probative of one of the enumerated mitigating circumstances, which we held unconstitutional in both *Lockett* and *Hitchcock*, and allowing the jury to hear whatever evidence the defendant would like to introduce and then telling the jury to consider that evidence only to the extent that it is probative of future dangerousness, which the plurality here finds constitutional.

Petitioner does not contend that the jury required special instructions in order to give complete consideration to any mitigating evidence that was relevant to whether he acted deliberately or to whether he constituted a future threat to society. His argument is limited to the rather simple truism that absent some instruction, given the structure of the Texas scheme, it is probable that the jury misapprehended the significance it could attach to mitigating evidence that was descriptive of petitioner's character rather than predictive of his future behavior. The instructions he sought would only have informed the jury that it could answer either or both of the Special Issues "no" if it found that the mitigating evidence justified a sentence less than death—whether or

not that evidence was relevant to deliberateness or future dangerousness — authority the jury assuredly had under the Constitution and under the Texas sentencing scheme as we have previously construed it. See *Jurek*, 428 U. S., at 273; *Adams* v. *Texas*, 448 U. S. 38, 46 (1980). Although it is remotely possible that the jury that sentenced petitioner intuitively understood that possibility, the Constitution does not permit us to take the risk that the jury did not give full consideration to the mitigating evidence petitioner introduced. *Mills* v. *Maryland*, 486 U. S., at 383–384. Under our cases, the substantial risk that the jury failed to perceive the full ambit of consideration to which evidence of petitioner's past good conduct was entitled requires us to vacate the death sentence and remand for resentencing. *Id.*, at 384; *Eddings*, 455 U. S., at 119 (O'CONNOR, J., concurring). Chief Justice Burger's words in *Lockett* apply fully and determinately to the case before us:

> "There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute [or evidentiary rule or jury instruction] that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." 438 U. S., at 605.

## II

The plurality introduces its discussion of general principles concerning the role of mitigating evidence in capital sentencing with the gratuitous advice that it is not inclined to overrule *Jurek* v. *Texas*, 428 U. S. 262 (1976), see *ante*, at 180. The observation that we rejected a facial challenge to the

constitutionality of the Texas statute in that case is, of course, entirely irrelevant here. As the plurality recognizes, *ante*, at 171, petitioner has not raised a challenge to the constitutionality of the Texas sentencing scheme. Rather, he has merely asserted that the trial court's failure to give the jury instructions he requested was constitutional error.

Our holding in *Lockett* previously has required us to vacate death sentences that were imposed pursuant to facially valid capital sentencing statutes. In *Eddings* v. *Oklahoma*, although the statute provided that a defendant could present evidence "as to any mitigating circumstances," 455 U. S., at 115, n. 10, we set aside the death sentence because it appeared that the trial judge had not considered certain mitigating evidence offered by defendant. See *id.*, at 112–113. In *Hitchcock*, 481 U. S., at 398–399, even though we had sustained the Florida capital sentencing statute against a facial attack in *Proffitt* v. *Florida*, 428 U. S. 242 (1976), we held that a Florida death sentence could not stand because the advisory jury had been instructed not to consider nonstatutory mitigating circumstances. The instant case is analogous; our decision in *Jurek* v. *Texas*, upholding the facial validity of the statute under which petitioner was sentenced to death is not dispositive of the question whether his Eighth Amendment rights were violated because the sentencer was in effect instructed not to consider certain relevant mitigating evidence.

After referring to "tension" between our cases holding that the sentencer's discretion in capital sentencing must be "directed and limited so as to minimize the risk of wholly arbitrary and capricious action," *Gregg* v. *Georgia*, 428 U. S. 153, 189 (1976), and our cases holding that the jury must be permitted to consider any relevant mitigating evidence adduced by the defendant, see *Eddings* v. *Oklahoma*, the plurality suggests that our holding in *Jurek* was premised on a recognition that Texas' scheme accommodated that tension. See

*ante,* at 182. To the contrary, our holding in *Jurek* did not turn on an understanding that the Special Issues performed a narrowing function; rather our concern there, as it is here, was whether the Special Issues interfered with the jury's full consideration of mitigating evidence.

Instead of employing a list of aggravating circumstances to limit. the scope of the jury's power to impose the death penalty, the Texas scheme defines the offense of capital murder in a manner that narrows the class. See *Lowenfield* v. *Phelps,* 484 U. S. 231, 245–246 (1988). This point was explained with some care in the joint opinion in *Jurek:*

> "The Texas Court of Criminal Appeals has thus far affirmed only two judgments imposing death sentences under its post-*Furman* law—in this case and in *Smith* v. *State,* No. 49,809 (Feb. 18, 1976). . . . In the present case the state appellate court noted that its law 'limits the circumstances under which the State may seek the death penalty to a small group of narrowly defined and particularly brutal offenses. This insures that the death penalty will only be imposed for the most serious crimes [and] . . . that [it] will only be imposed for the same type of offenses which occur under the same types of circumstances.' 522 S. W. 2d, at 939.
>
> "While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose. See *McGautha* v. *California,* 402 U. S. 183, 206, n. 16 (1971); Model Penal Code § 201.6, Comment 3, pp. 71–72 (Tent. Draft No. 9, 1959). In fact, each of the five classes of murders made capital by the Texas statute is encompassed in Georgia and Florida by one or more of their statutory aggravat-

ing circumstances. For example, the Texas statute re-
quires the jury at the guilt-determining stage to consider
whether the crime was committed in the course of a par-
ticular felony, whether it was committed for hire, or
whether the defendant was an inmate of a penal institu-
tion at the time of its commission. Cf. *Gregg* v. *Georgia,
ante,* at 165–166, n. 9; *Proffitt* v. *Florida, ante,* at
248–249, n. 6. Thus, in essence, the Texas statute re-
quires that the jury find the existence of a statutory ag-
gravating circumstance before the death penalty may be
imposed. So far as consideration of aggravating circum-
stances is concerned, therefore, the principal difference
between Texas and the other two States is that the
death penalty is an available sentencing option—even
potentially—for a smaller class of murders in Texas.
Otherwise the statutes are similar. Each requires the
sentencing authority to focus on the particularized na-
ture of the crime." 428 U. S., at 270–271.

Having approved the manner in which the Texas statute
narrowed the class of murders for which the death sentence
could be imposed, we confronted directly the question
whether the Texas statute was nevertheless invalid because
the Special Issues might interfere with the requirement that
the jury must be allowed to consider "all relevant evidence"
offered to demonstrate why the death penalty "should not be
imposed."[2] Although the Texas Court of Criminal Appeals
had not yet precisely defined the meanings of the terms used
in the Special Issues, we understood the two decided cases on
the question to indicate that the jury would be given a full
opportunity "to consider whatever evidence of mitigating cir-
cumstances the defense can bring before it." *Id.,* at 273.
Thus, nothing in *Jurek* implies that the Special Issues could

---

[2] As the joint opinion emphasized:

"A jury must be allowed to consider on the basis of all relevant evidence
not only why a death sentence should be imposed, but also why it should
not be imposed." 428 U. S., at 271.

be used to curtail the defendant's right to have the sentencing decision made on the basis of all relevant mitigating evidence.

It is important to recognize that our holdings that the jury must be given the opportunity to consider, for whatever weight it might bear, any evidence relevant to a defendant's character or record or the circumstances of the offense do not give rise to the danger of arbitrary, capricious, and discriminatory decisionmaking that attends the vesting of unbridled discretion in the sentencer. We recognized this fact in *Gregg* v. *Georgia*, when we upheld Georgia's sentencing scheme against an Eighth Amendment challenge. The Georgia scheme permitted the jury to consider all mitigating evidence the defendant wished to introduce, but our decision nowhere suggested that in so doing the statute failed sufficiently to narrow and guide the discretion of the sentencer. We specifically noted that the existence of discretion to remove a particular defendant from the class of persons on whom death may be imposed did not offend the Constitution, see 428 U. S., at 199, 203; this is especially so when the sentencer is directed to exercise that discretion on the basis of evidence related to the defendant's crime or record or the circumstances of the offense. As JUSTICE WHITE stated:

"The Georgia Legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute, and I cannot accept the naked assertion that the effort is bound to fail. As the types of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is peculiarly appropriate as they are in Georgia by reason of the aggravating-circumstance requirement, it becomes reasonable to expect that juries—even given discretion *not* to impose the death penalty—will impose the death pen-

alty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly and freakishly or so infrequently that it loses its usefulness as a sentencing device." *Id.*, at 222 (opinion concurring in judgment)

In requiring that the discretion of the sentencer in capital sentencing be guided, we have never suggested that the sentencer's discretion could be guided by blinding it to relevant evidence. The hallmark of a sentencing scheme that sufficiently guides and directs the sentencer is the presence of procedures that "require the jury to consider the circumstances of the crime and the criminal before it recommends sentence." *Id.*, at 197. The requirement that the State not bar the sentencer from considering any mitigating aspect of the offense or the offender only furthers the goal of focusing the sentencer's attention on the defendant and the particular circumstances of the crime.

If, as the plurality suggests, see *ante*, at 182, the Texas scheme limits the sentencer's consideration to only that mitigating evidence that bears on one or more of the Special Issues, then it is constitutionally infirm. The requirement that the sentencer's discretion be guided and channeled was intended to enlighten the jury's decisionmaking process, not to license the States to place blinders on juries. A scheme that permitted the sentencer to disregard evidence relevant to an understanding of the crime and the person who committed it would *create* tension with our cases requiring that the sentencing scheme be one that focuses the sentencer's attention on such evidence and with our cases requiring that the sentencer be permitted to consider all relevant mitigating evidence.

The joint opinion in *Jurek* reflects our concern about whether the Texas scheme would allow the jury to give proper weight to mitigating evidence. The Court merely found it reasonable to rely on evidence that the Special Issues "were written to direct and guide the jury's deliberations and

to focus their attention . . . upon the presence of *any possible* mitigating factors," Brief for Respondent in *Jurek* v. *Texas*, O. T. 1975, No. 5394, p. 26 (emphasis added), and that the Texas Court of Criminal Appeals had interpreted the second Special Issue to allow the jury "to consider whatever evidence of mitigating circumstances the defense can bring before it." *Jurek*, 428 U. S., at 273.

As we said in *Jurek:* "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced." *Id.*, at 276. The essential requirement we found satisfied in *Jurek* was not met in this case. If the Texas scheme is as we found it to be in *Jurek*, this shortcoming was merely the result of an error in instructing the jury. No matter what the ultimate cause is determined to be, however, it is clear that petitioner's Eighth Amendment rights were violated and that the violation would not have occurred had the trial court given the jury the instructions sought by petitioner.

I respectfully dissent.