**Albert F. MOORE, Jr., Petitioner,**

v.

**Joseph PONTE, Respondent.**

**C.A. No. 91–10483–NG.**

United States District Court, D. Massachusetts.

May 10, 1996.

John H. LaChance, Framingham, MA, for Albert F. Moore, Jr.

Albert F. Moore, Jr., Norfolk, MA, pro se.

Neil S. Tassel, Boston, MA, Linda Nutting Murphy, Attorney General's Office, Criminal Bureau, Boston, MA, for Joseph Ponte.

## MEMORANDUM AND DECISION

GERTNER, District Judge.

### I. PROCEDURAL BACKGROUND

On June 28, 1976, petitioner Albert F. Moore, Jr. was found guilty of First Degree Murder by an Essex Superior Court jury and received a sentence of life imprisonment without parole. On August 29, 1979, the Massachusetts Supreme Judicial Court affirmed Moore's conviction. *See Commonwealth v. Moore,* 379 Mass. 106, 393 N.E.2d 904 (1979).

On October 28, 1988, defendant filed a motion for a new trial. This motion was amended on October 5, 1989 to allege ten errors by the trial court. On January 4, 1990, the trial judge denied the motion, stating as follows:

Having examined the written motion and the memorandum and whereas it appears the grounds advanced were not such as would require an evidentiary hearing and

mostly were previously advanced or known but not raised in any earlier proceeding and trial and where it further appears from the court's review that the grounds advanced are without merit, *denied.*

In June, 1990, petitioner sought discretionary leave to appeal the denial of his new trial motion to the Massachusetts Supreme Judicial Court. *See* M.G.L. c. 278 § 33E. On October 10, 1990, a single justice of the Supreme Judicial Court denied petitioner leave to appeal on the ground that the issues raised by his motion were neither new nor substantial.

On February 6, 1991, petitioner, acting *pro se*, filed this petition for writ of habeas corpus asserting the same ten claims of error raised in his motion for a new trial. On March 9, 1993, this Court, Keeton, J., issued an order dismissing counts 1–3 and 5–10 on the ground that they were procedurally barred because the state courts had rejected them on independent and adequate state law grounds, a rejection immune from federal court review. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The Court appointed counsel to represent petitioner on the remaining count, Count 4, which alleged that petitioner was denied due process of law because he was kept in a so-called prisoner's dock during his trial. The matter was subsequently transferred to the undersigned.

Before the Court is Count 4 of the petition and petitioner's Motion for Reconsideration of the Issue of Procedural Bar, by which he seeks to revisit Judge Keeton's earlier decision dismissing the remaining counts.

Although I find the use of the prisoner's dock may have been constitutional error under the circumstances of petitioner's trial, I also find that the error, if any, was harmless.

Accordingly, I **DENY** the petition for writ of habeas corpus with respect to Count 4. I also **DENY** petitioner's motion for reconsideration except as to Counts 1 and 2, for which it is **ALLOWED**. After reconsideration, I **DISMISS** Count 1 on the merits but reserve consideration of Count 2 pending further briefing.

## II. COUNT 4 (THE PRISONER'S DOCK ISSUE)

■ In Count 4, petitioner contends that his conviction was constitutionally defective because the trial judge refused his request to sit at counsel table and instead required him to sit in a so-called "prisoner's dock" during the course of his trial.[1] At the time of petitioner's trial, use of the prisoner's dock was common practice in Massachusetts courts, and the determination of whether the defendant was to sit there or at counsel table was left to the discretion of the judge. *See Commonwealth v. Moore,* 379 Mass. at 109, 393 N.E.2d 904.

After his conviction, petitioner raised the prisoner's dock issue in his direct appeal. In June, 1979, while petitioner's appeal was pending, the First Circuit issued its opinion in *Walker v. Butterworth,* 599 F.2d 1074 (1st Cir.1979) *cert. denied* 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979). *Walker* involved a petition for writ of habeas corpus in which the prisoner had alleged that his confinement in a prisoner's dock constituted constitutional error. Although the writ was granted on other grounds, the court addressed the prisoner's dock issue in dicta, stating that "the Massachusetts prisoner dock must be considered, as a general matter, to be an unconstitutional practice." *Walker,* 599 F.2d at 1081.[2]

---

1. The Massachusetts prisoner's dock has been described as follows:

   The dock is a box approximately four feet square and four feet high. It is open at the top so that the defendant's head and shoulders can be seen when he or she is seated. The dock is placed typically at the center of the bar enclosure which separates the spectator's section from that portion of the courtroom reserved for trial principals. The dock is usually fifteen to twenty feet behind counsel table, and is sometimes on a raised platform.

*Walker v. Butterworth,* 457 F.Supp. 1233, 1238 (D.Mass.1978) *rev'd,* 599 F.2d 1074, *cert. denied,* 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979).

2. One judge of the panel would have found the use of the dock to be reversible constitutional error, a second judge found the record insufficient to make such a finding, and an third would not have considered the issue until such time as it was necessary to the outcome of the case. *Walker,* 599 F.2d at 1081, n. 7.

When the Supreme Judicial Court reviewed petitioner's conviction, it too considered the issue of the prisoner's dock. *See Moore*, 379 Mass. at 107–111, 393 N.E.2d 904. The Court concluded that as a general matter, trial judges should honor a defendant's request to sit at counsel table, but that the use of the dock was not objectionable in situations "where inquiry reveals that some security measures are necessary, and [where] the dock is the least restrictive measure available." *Id.* at 111, 393 N.E.2d 904. Although the record revealed no such inquiry in petitioner's case, the SJC held that any resulting error was harmless, in that defendant was able to consult with defense counsel throughout the trial, and the trial judge forcefully instructed the jury to draw no negative inference from petitioner's being seated in the dock. *Id.*

Three years after petitioner's conviction became final, the First Circuit directly addressed the prisoner's dock issue in *Young v. Callahan*, 700 F.2d 32 (1st Cir.1983) *cert. denied*, 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983). In *Young*, the court held that, under the circumstances of the case (primarily the defendant's prior record of good behavior at trial and the lack of any judicial finding of necessity) that use of the prisoner's dock was unconstitutional.[3] Applying the "harmless beyond a reasonable doubt" standard in force at the time, the Court ordered the writ to issue. *Id.* at 35–37.

Petitioner now seeks, on collateral review, the relief which the Supreme Judicial Court denied him on his direct appeal. In essence, petitioner contends that the use of the dock in his case was unconstitutional because the trial judge did not make, and could not have made, findings that his placement in the dock was required by any concern for security. Before addressing the substance of this claim, I must first address the government's contention that petitioner's claim is barred by the non-retroactivity doctrine of *Teague v.*

*Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

### A. The Teague Non–Retroactivity Doctrine

#### 1. The Development of the Teague Doctrine

In *Teague*, a plurality of the Supreme Court announced a new standard for determining whether new rules of law should apply retroactively to cases on collateral review. After deciding that the principal purpose of habeas corpus review is to insure that state trials are conducted according to the constitutional standards in place at the time, the *Teague* plurality concluded that, ordinarily, a new rule of constitutional law should not be applied retroactively to scrutinize convictions which became final prior to its announcement. 489 U.S. at 306, 310, 109 S.Ct. at 1073, 1075. The plurality found only two narrow exceptions to this general principle of non-retroactivity: where the new rule "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" or where "it requires observance of those procedures that are implicit in the concept of ordered liberty." *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073. A majority of the Court has since adopted this standard, making it binding precedent. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Saffle v. Parks*, 494 U.S. 484, 488–495, 110 S.Ct. 1257, 1260–1264, 108 L.Ed.2d 415 (1990).

*Teague*'s deceptively simple injunction against retroactive rule application in habeas cases has proven to be anything but straightforward in its application. Indeed, the decision has drawn habeas courts into an epistemological morass. They face the impossible task of discovering objective "newness" within an allegedly seamless web of judge-made constitutional doctrine. The result, as some commentators have noted, is that within the body of appellate habeas case

---

**3.** In a 1980 case, *Bumpus v. Gunter*, 635 F.2d 907 (1st Cir.1980) *cert. denied*, 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207 (1981), the court held that use of the prisoner's dock was not error where the trial judge found specific security con-

cerns which justified use of the dock. In that case, the defendant's prior conduct was characterized as "erratic and highly unstable." *Id.* at 914.

law, there appears to be "little to distinguish the rules which have been denominated 'new' from those deemed not to be 'new.'" James S. Liebman and Randy Hertz, Federal Habeas Corpus Practice and Procedure, § 25.5, p. 769–771 (2nd ed. 1994).

Part of the confusion, no doubt, stems from the Supreme Court's own inconsistent formulation and application of the *Teague* standard.[4] Even within the same paragraph, *Teague* offers conflicting definitions. It defines a new rule as one which "breaks new ground or imposes a new obligation on the States or Federal government", suggesting that a rule is new if it represents an overturning or at least a clear break with past practice. 489 U.S. at 301, 109 S.Ct. at 1070 (plurality opinion). In the very next sentence, however, *Teague* states that a rule is new if it "was not dictated by precedent." *Id.* This second characterization suggests that "newness" is a very broad concept encompassing any holding which is not the purely logical consequence of prior doctrine.

The ambiguity of *Teague*'s formulation is made evident by an analysis of its progeny. In *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the first case applying *Teague*, the Court overturned the death sentence of a mentally retarded prisoner who had been sentenced under Texas' so-called "special issues" capital sentencing scheme. Under Texas law, a jury determines whether the defendant in a capital murder case will be sentenced to death by answering "yes" or "no" to three questions: whether the murder was "deliberate," whether the defendant is likely to constitute a continuing threat to society, and whether, if raised by the evidence, the conduct of the defendant was an unreasonable response to the provocation of his victim. If all three questions are answered "yes", the defendant must be sentenced to death. *See Penry*, 492 U.S. at 310, 109 S.Ct. at 2942.

The *Penry* Court concluded that, although the prisoner had been permitted to present evidence of his mental retardation to the jury, the Texas framework was flawed be-cause it did not provide the jury with a "vehicle" for including that information in its determination of whether the prisoner deserved to be sentenced to death. 492 U.S. at 319–329, 109 S.Ct. at 2947–2952.

The Court also concluded, over the objection of four justices, that its holding was not a "new rule", and therefore was not barred by *Teague*. It reached this conclusion in spite of the fact that the facial validity of the Texas sentencing scheme had been upheld in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and even though another "as applied" challenge to the law, *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (relating to presentation of mitigating evidence of the defendant's good behavior in prison) had been rejected as well.

Distinguishing *Franklin* and reconciling *Jurek*, the Court in *Penry* held that its conclusion was compelled by the more general, earlier, rule found in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), which held that a sentencer in a capital case may not refuse to consider any mitigating evidence presented by the defendant. *Penry*, 492 U.S. at 319–328, 109 S.Ct. at 2947–2952. The Court reached this conclusion in spite of its still fresh holding in *Franklin*, which upheld the death sentence of a prisoner who had presented evidence of his good behavior in prison to the jury, but claimed that the "special issues" framework did not allow the jury to mitigate his sentence based on that fact.

*Penry* was issued by a sharply divided Court, and subsequent cases suggest that the Court has yet to reach doctrinal equilibrium in this area. In *Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), the Court, in another 5–4 decision, held that the rule in *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (Fifth Amendment bars police-initiated interrogation following a suspect's request for counsel in a separate investigation) was

---

**4.** This is particularly ironic given the Court's insistence that the *Teague* standard was required to make its habeas jurisprudence more princi-pled. *See Teague*, 489 U.S. at 309, 109 S.Ct. at 1074–75.

"new" within the meaning of *Teague,* and therefore not cognizable on habeas review. It found *Roberson* to be "new" even though six members of the Court in that case had agreed that the outcome was directly controlled by *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (requiring the police, during continuous custody, to refrain from all further questioning once an accused invokes the right to counsel on any offense). According to *Butler,* even where the Supreme Court later concludes that its decision is "controlled" or "governed" by prior opinions, it announces a new rule so long as other courts may have reached "reasonable contrary conclusions." *Id.* 494 U.S. at 415, 110 S.Ct. at 1217. In so doing, the majority concluded that the *Teague* rule "validates reasonable good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler,* 494 U.S. at 414, 110 S.Ct. at 1217.

Similarly, in *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), a 5–4 majority refused on *Teague* grounds to consider a "new rule" which would have required that capital sentencing juries be permitted to base their decision, in part, on sympathy for the defendant. Ironically, *Saffle* involved the very same Texas "special issues" framework which had been successfully challenged in *Penry,* only with the challenge being to instructions regarding consideration of sympathy rather than mental retardation. Adhering to *Butler's* gloss on *Teague,* the Court found that even if the prisoner's proposed rule was "controlled or governed" by the same cases the Court relied upon in *Penry,* it was "new" because it was possible for courts acting in good faith to have reached an opposite conclusion. *Saffle,* 494 U.S. at 488, 110 S.Ct. at 1260. *See also Sawyer v. Smith,* 497

U.S. 227, 234, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990).

The *Butler–Saffle–Sawyer* line of cases, all decided in 1990, appeared to suggest an extremely broad concept of "new rule" which limited habeas relief only to "the most egregious cases, in which state courts have flouted applicable Supreme Court precedent that cannot be distinguished on any arguable basis." *Butler,* 494 U.S. at 432, 110 S.Ct. at 1226–27 (Brennan, J., dissenting).[5] By 1992, however, a majority of Justices appear to have retreated from this position.

In *Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), the Court vacated a death sentence imposed under a Mississippi statute which included, among the factors which could be considered by the sentencing jury, whether the murder was "especially heinous, atrocious or cruel." In reaching its conclusion that Stringer should be sentenced to death, the sentencing jury had found the existence of this factor, along with two others. The Court concluded that the use of the "especially heinous" factor violated the Eighth Amendment, since it failed to adequately narrow the class of murderers eligible for the death sentence.

The Court further concluded that its holding was not a "new rule" because it was dictated by its earlier holding in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). *See Stringer,* 503 U.S. at 228–229, 112 S.Ct. at 1135–1136. In *Godfrey,* the Court vacated a Georgia capital sentence which had been based solely on a similarly worded aggravating factor. Unlike *Stringer,* however, the sentence in *Godfrey* had not been supported by other, valid, aggravating factors.[6] In addition, *Godfrey* addressed a capital sentencing scheme in which

---

5. It is striking to compare the scope of the *Butler–Saffle–Sawyer* "new rule" concept with the views of Justice Harlan, whose conception of non-retroactivity in habeas cases the *Teague* Court supposedly adopted. Justice Harlan opined that "many, though not all, of this Court's constitutional decisions [are not new because they] are grounded upon fundamental principles whose content does not change dramatically from year to year, but whose meanings are altered slowly and subtly as generation succeeds generation." *Desist v. U.S.,* 394 U.S. 244, 263,

89 S.Ct. 1030, 1041, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting).

6. The presence of additional aggravating factors was held sufficient to validate a death sentence based in part on an invalid factor in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) and *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). *See Stringer,* 503 U.S. at 239–241, 112 S.Ct. at 1141–1142 (Souter, J., dissenting).

the role of aggravating factors differed significantly from that in *Stringer*.[7] The Court acknowledged the presence of these factual differences, acknowledged that the applicability of *Godfrey* to Mississippi's type of capital sentencing regime had been explicitly left open in an earlier case, and noted that the Fifth Circuit had concluded that *Godfrey* did not control. Nonetheless, it found that the differences between *Godfrey* and the facts in *Stringer* "could not have been considered a basis for denying relief in light of precedent existing at the time petitioner's sentence became final." *Stringer,* 503 U.S. at 229, 112 S.Ct. at 1135–1136.[8] Thus, while the Court continued to invoke the apparently rigorous principles of the *Butler–Sawyer–Saffle* line of cases in determining what was a "new rule", its application of those principles in *Stringer* appears to have been significantly more forgiving than a strict application would suggest.

There is no need to dwell here on *Teague*'s subsequent progeny, except to note that they continue to be characterized by fractured opinions and close votes.[9] The Court's difficulties in reaching doctrinal closure in all of these cases illustrates the basic conceptual problem with the *Teague*'s "new rule" formulation. With the exception of actual over-

rulings of precedent, almost any holding by a court can be characterized equally well as the application of prior law or as the establishment of a new rule. It all depends on the level of generality on which the analysis takes place. *See Wright v. West,* 505 U.S. 277, 311–312, 112 S.Ct. 2482, 2500–2501, 120 L.Ed.2d 225 (1992) (Souter, J., concurring in the judgment) (noting that "[a] rule old enough for *Teague* may of course be too general" but failing to provide guidance in making this determination).

At the most general level, all constitutional decisions are applications of pre-existing rules, namely the rules found in the Constitution itself. Much of our constitutional jurisprudence, for example, springs from the application of the rule against denial of due process found in the Fifth and Fourteenth Amendments. While the due process clause has spawned diverse subsidiary doctrines—from the necessity of proof beyond a reasonable doubt in criminal trials (*see In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)) to the minimum contacts test in state long-arm cases (*see International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945))—each of these distinct rules can be seen as mere application of the rule

---

**7.** In *Stringer,* the capital sentencing scheme was of the "weighing" type, in which all of the aggravating factors are weighed against the mitigating factors to determine whether the death penalty applies. By contrast, the scheme at issue in *Godfrey* was "non-weighing." To impose the death penalty under that scheme, the jury first needed to find at least one aggravating factor. Then it considered "all of the circumstances of the case" to determine whether the death penalty should be imposed. The jury was not specifically required to weigh the mitigating circumstances against the aggravating ones.

**8.** The dissent would have found a new rule. It noted that at the time of prisoner's conviction, a death sentence in a "weighing" state (such as Mississippi) had never before been struck down because of a vague aggravating factor, and that the Supreme Court had twice sustained convictions in which one of multiple aggravating factors had been found to be improper. 503 U.S. at 244–245, 112 S.Ct. at 1143–1144 (Souter, J., dissenting).

**9.** *See Wright v. West,* 505 U.S. 277, 112 S.Ct. 2482 (unanimous judgment, but five separate

opinions); *Graham v. Collins,* 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) (5–4 decision); *Gilmore v. Taylor,* 508 U.S. 333, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (7–2 decision, four separate opinions).

While the Court has shown less dissension in two more recent cases, it is apparent that the Justices in those cases believed the proposed rule to be not only new, but contrary to precedent which existed at the time of his conviction. *See Caspari v. Bohlen,* 510 U.S. 383, ——– ——, 114 S.Ct. 948, 954–55, 127 L.Ed.2d 236 (1994) (prisoner's claim that upward resentencing in a noncapital case violates double jeopardy clause "would appear to be foreclosed by the fact that historically, the pronouncement of sentence has never carried the finality that attaches to an acquittal"); *Goeke v. Branch,* —— U.S. ——, ——, 115 S.Ct. 1275, 1277, 131 L.Ed.2d 152 (1995) ("Neither respondent nor the [court below] identifies existing precedent for [prisoner's] proposition that there is no substantial basis for appellate dismissal when a defendant fails to appear at sentencing, becomes a fugitive, demonstrates contempt for the legal system, and imposes significant cost and expense on the State to secure her recapture.").

requiring "due process" in particular contexts and to particular sets of facts.

Even where a derivative constitutional rule is well established, the outcome will be different simply depending upon how the issue is characterized. If a state court's holding is characterized as a mixed fact-law determination, the federal court need not defer to the state court's ruling, and *Teague*'s retroactivity analysis is not an issue. *Miller v. Fenton,* 474 U.S. 104, 117, 106 S.Ct. 445, 453, 88 L.Ed.2d 405 (1985). Conversely, if a state court ruling is characterized as the application of a rule to a particular set of facts, *Teague* prevents the habeas court from substituting its own judgment unless it first determines that the rule it is applying is not a "new" one. The underlying concerns of *Teague*, to validate reasonable state interpretations of federal precedent, *Stringer,* 503 U.S. at 237, 112 S.Ct. at 1140, are not even addressed when the court characterizes the problem as a mixed fact-law question and engages in an "independent review." *Miller,* 474 U.S. at 117, 106 S.Ct. at 453.

A recent case, *Thompson v. Keohane,* —— U.S. ——, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), illustrates the problem. In *Thompson,* the petitioner had been convicted of the murder of his ex-wife, based in part upon a confession he had given to the police. The confession had been obtained while the petitioner was being interrogated in a police station to which he had been lured under false pretenses. The issue raised in the habeas petition was whether this confession should have been suppressed, since it was obtained without the petitioner having been given *Miranda* warnings.

The courts below had denied habeas relief, deferring to the state court's determination that the prisoner had not been in custody (and was therefore not entitled to a *Miranda* warning). The Supreme Court, in a 7–2 decision, reversed, holding that the "in custody" determination was a mixed question of fact and law, which required an independent determination by the federal court.

Although *Teague* was only mentioned in the dissent (and then only in passing), *see Thompson,* —— U.S. ——, ——, nn. 1, 2, 116 S.Ct. 457, 469, nn. 1, 2 (Thomas, J., dissenting) (noting the apparent inconsistency of independent review and the validation of reasonable interpretations), the case provides yet another illustration of the conceptual problems in this area. Under *Thompson,* a habeas court must make an independent determination of the mixed fact and law question whether a prisoner is "in custody" for the purposes of *Miranda.* An alternative formulation of the very same question, however, is whether the state court should have applied a different "rule"—a broader definition of "custody"—than it did. Under this paradigm, the habeas court could not overrule the state court's determination unless it first decided that its definition of "custody" was not a new rule within the meaning of *Teague.* Yet this conclusion would seem to be inconsistent with *Miller*'s injunction that habeas courts engage in *de novo* review.[10]

10. The doctrinal confusion in *Thompson v. Keohane* is presaged in the earlier case of *Wright v. West,* 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992). In *Wright,* the prisoner sought habeas review of his conviction under Virginia law for grand larceny, claiming that he was deprived of due process because the verdict was not supported by sufficient evidence at trial. The principal issue before the Court was the appropriate standard of review for a federal court to use in reviewing the state conviction. The government argued that the Virginia Supreme Court had often upheld grand larceny convictions based on similar evidence, and thus characterized the prisoner's position as requiring the announcement of a new rule within the meaning of *Teague.* By contrast, the prisoner characterized the issue of the sufficiency of the evidence issue as a "mixed question of fact and law", and, relying on *Miller* · *v. Fenton, supra,* sought *de novo* review in federal court.

Although all of the Justices ultimately concluded that the evidence in *Wright* was constitutionally sufficient, regardless of the standard of review, no more than three Justices were able to agree on a particular analytic framework. Justice Thomas, joined by two other justices, noted (but declined to resolve) an apparent conflict between *Teague* and *Miller: Teague* required habeas courts to "validate reasonable interpretations of existing precedents", *Stringer,* 503 U.S. at 237, 112 S.Ct. at 1140, while *Miller* suggests that at least certain types of interpretations (i.e. mixed questions of fact and law), must be decided anew by the habeas court, thus ignoring the state court's interpretation entirely. *See Wright,* 505 U.S. at 284–295, 112 S.Ct. at 2485–2492 (Opinion of Thomas, J.).

## 2. Application of Teague

Notwithstanding the apparent incongruities in the Supreme Court's non-retroactivity doctrine, I am bound by the Court's most recent guidance on the subject. In *Caspari v. Bohlen*, 510 U.S. 383, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994), the Court held that to determine whether a rule is "new" a habeas court must "survey the legal landscape" as it existed at the time petitioner's conviction became final, and "determine whether a state court considering [his] claim at the time his conviction became final would have felt compelled by existing precedent to conclude the rule he seeks was required by the Constitution." 510 U.S. at ——, 114 S.Ct. at 953. This determination is an "objective" one, and "the mere existence of conflicting authority does not necessarily mean a rule is new." *Wright*, 505 U.S. at 304, 112 S.Ct. at 2497 (Plurality opinion of O'Connor, J.). Applying these principles to the case at hand,[11] I find

Justice O'Connor, also writing for two other justices, was emphatic that *Teague* in no way conflicted with *Miller. See Wright*, 505 U.S. at 303–305, 112 S.Ct. at 2496–2498 (Opinion of O'Connor, J.). She emphasized that the *Teague* standard was "objective", and that "the mere existence of conflicting authority does not necessarily mean a rule is new." *Id.* at 304, 112 S.Ct. at 2497. In applying *Teague*, Justice O'Connor stated that a court "must make an independent evaluation of the precedent existing at the time the state conviction became final in order to determine whether the case under consideration is meaningfully distinguishable." *Id.* Justice O'Connor's opinion does not, however, explain how to distinguish between a case in which the habeas court merely disagrees with the state court's application of precedent to a "meaningfully distinguishable" set of facts (thereby declaring a new rule inapplicable on habeas review under *Teague*), and a case in which *Miller* requires the court to decide *de novo* whether the state court's "mixed fact-law" conclusions about that set of facts were correct.

Similarly, Justice Kennedy, writing only for himself, attempts to resolve *Teague* and *Miller* by significantly shifting the boundary between "rule" and "fact". According to Justice Kennedy, the result in *Wright* is merely the "application" of a "rule of ... general application." *Wright*, 505 U.S. at 308–309, 112 S.Ct. at 2499–2500 (Opinion of Kennedy, J.). "If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule." *Id.* at 308, 112 S.Ct. at

that *Young* did not announce a new rule within the meaning of *Teague*.

The First Circuit held in *Young* that the use of the prisoner's dock was, "under all of the circumstances of [the] case", constitutional error. 700 F.2d at 37. The Court also held that, in the absence of a curative instruction and in light of the particular facts of the case, such error was not harmless. *Id.* In determining whether this outcome was compelled by the existing legal landscape at the time of petitioner's trial, I note at the outset that the legal landscape I must survey here is relatively featureless. Although use of the prisoner's dock was apparently not a tradition unique to Massachusetts, it appears that most other states had abolished the practice years earlier, long before modern conceptions of criminal procedure had taken hold. *See Young*, 700 F.2d at 36, nn. 5, 6. Thus, it appears, only in Massachusetts have prisoners sought relief from federal courts over the use of a prisoner's dock at trial.

2499. Justice Kennedy's opinion suggests that *Teague* is not a barrier to habeas review, so long as the habeas court grounds its conclusions on a sufficiently fact-intensive standard.

Finally, Justice Souter adopted a position diametrically opposed to that of Justice Kennedy. While Justice Kennedy would permit the application of general standards to specific facts, Justice Souter took the position that a rule should properly be applied under *Teague* only if it is "old enough to have predated the finality of the prisoner's conviction, and *specific enough to dictate the rule on which the conviction may be held to be unlawful.*" *Wright*, 505 U.S. at 311, 112 S.Ct. at 2500–2501 (Opinion of Souter, J.) (emphasis added). In other words, under Justice Souter's understanding of *Teague*, the application of a general rule to specific facts is always barred by *Teague* unless prior cases had already determined how the rule should be applied under the specific facts of the case.

11. There is, arguably, a threshold question which must be answered in the affirmative before this Court even considers whether *Teague* bars application of *Young*: whether a court's determination of the appropriateness of physical restraints in the courtroom constitutes the announcement of a rule subject to *Teague* analysis, or whether it constitutes a mixed finding of law and fact, subject to *de novo* review by this Court under *Miller v. Fenton* and *Thompson v. Keohane, supra.*

This issue was not briefed by the parties, and I need not decide it, since, as I explain below, any error regarding use of the prisoner's dock was harmless.

This lack of prior litigation does not, however, mean that use of the prisoner's dock was a legal novelty. Indeed, as the Court of Appeals noted in *Young*, the fact that use of the dock had been abolished in most other states is itself "not without some constitutional significance." *Id.* at 36.

Moreover, all of the legal authorities to which a judge of the time might have referred were unanimous in condemning unnecessary badges of incarceration. The most significant of these is *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), decided one month before petitioner's conviction, which held unconstitutional a requirement that a defendant wear identifiable prison garb during his trial. Although *Estelle* concerned prison garb and not a prisoner's dock, much of the reasoning of the opinion is applicable to both. The Court stressed that the presumption of innocence "is a basic component of a fair trial under our system of criminal justice." *Id.* at 503, 96 S.Ct. at 1692. The Court continued:

> To implement the presumption, courts must be alert to factors that may undermine the fairness of the factfinding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.
>
> The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.

*Id.* at 503–504, 96 S.Ct. at 1693 (citations omitted). The Court went on to note the virtually unanimous view among lower courts that the compelled wearing of prison garb was unfair to defendants, since it served as a constant reminder to participants and spectators of the defendant's condition of incarceration. It also found that having the prisoner wear such garb furthered no essential state policy, and tended to prejudice in particular those who could not afford bail prior to trial. *Id.* at 504–505, 96 S.Ct. at 1693–1694.

Moreover, in *Walker v. Butterworth*, decided before petitioner's conviction became final, the Court of Appeals, in *dicta*, sharply criticized use of the dock, declaring it "as a general matter, to be an unconstitutional practice." 599 F.2d at 1081. The Court examined and rejected defenses of the dock either as a means of identifying the defendant or as a security measure, further describing it as "an anachronism in a modern criminal trial which could have been abandoned years ago." 599 F.2d at 1080–1081.

It is also notable that the *Estelle* Court cited with approval the ABA Standards for Criminal Justice, which rejected the practice of mandating use of prisoner garb in the courtroom. 425 U.S. at 504, 96 S.Ct. at 1693. These same standards, which were adopted more than a decade before petitioner's conviction became final, specifically provide that "[d]efendants and witnesses should not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order." *Young*, 700 F.2d at 35–36 (quoting ABA Project on Standards for Criminal Justice, Trial by Jury § 4.1, pp. 91–92 (App. Draft 1968)).

Also pertinent to this inquiry are cases addressing the use of other types of physical restraints in the courtroom, such has handcuffing or shackling. Although courts have generally permitted the use of such devices where the trial judge perceives a potential security risk, *see, e.g. Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) (concerning the presence of state troopers in court), it is a longstanding rule in American courts that, ordinarily, "a prisoner brought into court for trial is entitled to appear free from all bonds or shackles." *Kennedy v. Cardwell*, 487 F.2d 101, 105 (6th Cir.1973) *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). *See also State v. Kring*, 64 Mo. 591, 593 (1877) (upon perceiving shackled defendant jury must "necessarily conceive a prejudice against the accused"); *People v. Harrington*, 42 Cal. 165, 168 (1871) ("any order or action of the Court which, without evident necessity, imposed

physical burdens, pains, and restraints upon a prisoner during the progress of his trial, inevitably tends to confuse and embarrass his mental facilities, and thereby materially to abridge and prejudicially affect his constitutional rights of defense"); *People v. Mendola,* 2 N.Y.2d 270, 159 N.Y.S.2d 473, 140 N.E.2d 353 (1957) ("During the trial accused should be free from shackles, except in so far as the trial court, in its sound discretion, deems them necessary to prevent the escape of accused or his forcible release, to restrain him from doing violence to others, or from injuring himself, or to prevent such misconduct as would obstruct the work of the court ...").

Even the Massachusetts courts had recognized, prior to petitioner's conviction, that "[s]hackling and other unusual security measures are of course to be avoided if possible. These displays tend to create prejudice in the minds of the jury by suggesting that a defendant is a bad and dangerous person whose guilt may be virtually assumed; they may interfere with a defendant's thought process and ease of communication with counsel; intrinsically they give affront to the dignity of the trial process." *Commonwealth v. Brown,* 364 Mass. 471, 475, 305 N.E.2d 830 (1973). In petitioner's direct appeal, the Massachusetts Supreme Judicial Court reiterated this position, and stated that "for the future", use of the prisoner's dock should be limited to those cases where "some form of security is essential." *Moore,* 379 Mass. at 110, 393 N.E.2d 904.

In sum, a judge surveying the legal landscape at the time petitioner's conviction became final would have perceived the following:

1) that American courts and legal commentators (particularly in the modern era) had uniformly disapproved of the use, without specific justification, of courtroom restraints on criminal defendants,

2) that the Supreme Court had held that the wearing of prison garb in the courtroom created prejudice against the defendant of a constitutional magnitude, and

3) that the only appellate court to specifically consider the prisoner's dock issue prior to the date petitioner's conviction became final strongly disapproved of it, describing it as an anachronism.

In light of these three factors, I conclude that the outcome in *Young* was "determined" by prior precedent, within the meaning of *Teague* and its progeny. In particular, I conclude that the law at the time petitioner's conviction became final required the trial judge to weigh the potential prejudice to the defendant of mandated badges of incarceration against the legitimate security needs of the court. I therefore turn to the facts of this case to determine whether the trial judge committed error by failing to comply with this rule.

### 3. *Whether Use of the Prisoner's Dock was Error*

The petitioner was convicted of first degree murder in the beating death of his supervisor. Thirty-five witnesses testified at his trial, which lasted for two and one-half weeks. At the outset of the trial, petitioner's trial counsel made the following request:

MR. GREENBERG. I have no objection, I got to thinking about that after Mr. Dalton, and I discussed it yesterday, and I had further requested whether or not the defendant could be allowed to sit with me rather than in the prisoner's dock for two reasons: one, he has a hearing problem, and I have had trouble in the past on pretrial matters where he is trying to listen and know what is going on. He had difficulty picking up the statements of counsel and witnesses.

THE COURT. They have got an amplifying system out there.

MR. GREENBERG. Secondly, there is something I supposed it is a visceral thing, I guess, that a man is really on trial for his life in terms of the most serious type of offense that he can be charged with and for that reason I can understand Mr. Dalton's desire to have the man principally investigated and knows about his case at his side, and I have always felt myself that in a case of this nature that it is just as critical for the defendant's counsel to have the quick access to his client at those moments.

Also, I know there is no basis that I know of in law for this, but there has always been something that has bothered me about that prisoner's dock, the effect that it has on the jury psychologically seeing a man in that enclosure. I remember the old Middlesex courthouse when they had the cage and some point that was taken down in terms of the ceiling to floor enclosure. Now we have this vestigial kind of thing called the dock, and I don't know, I would like if the Court would permit it to be able to sit with him at the table.

THE COURT. Put that off. I don't know what the problems are, if any, so I will just put that aside.

The trial judge later stated that he would make an inquiry to the Sheriff, who "has the responsibility of security" with reference to counsel's request to have the defendant seated at counsel table.

The next day, still prior to trial, the issue was raised again:

MR. GREENBERG. Your Honor, I wanted to raise with the Court at this juncture the question that I had discussed earlier, and that was whether or not the Court would grant leave for the defendant to sit at counsel table with me?

THE COURT. Mr. Greenberg, I am sorry I forgot about that matter to bring it up in the lobby, because I have given it considerable consideration, and upon reflection, I will deny that motion, and we will note your exception.

Trial then proceeded with petitioner sitting in the dock. The government's evidence at trial was substantial. Five independent witnesses testified that petitioner had admitted to them on separate occasions that he had committed the murder. Three of these witnesses testified concerning significant details of the crime. While two of these witnesses were fellow prisoners and one a police officer, the two others were a neighbor and a close friend and drinking companion of the petitioner, and had no obvious motive for fabricating testimony. Moreover, substantial physical and circumstantial evidence connected petitioner to the crime scene:

—petitioner was drinking heavily on the night of the murder, and did not return home until the next morning;

—petitioner, who lived elsewhere, was in the vicinity of the crime scene at 2:00 a.m. on the night of the murder;

—a trained police dog followed petitioners scent to the victim's building, to a telephone box where the phone wires were cut, to the victim's condominium, to the victim's bed where he was found dead, into the bathroom, out of the condominium to the rear of another building in the complex, to a vacant unit, then out to a grassy area where the trail ended;[12]

—petitioner was seen the morning after the murder wearing different clothes than those we was wearing when he left home the night before, even though he had been out all night;

—petitioner had a motive: the victim was his boss, and had discovered him stealing and had criticized his job performance, and petitioner had often expressed his hatred for the victim;

—occult blood was found on the fingers of petitioner right hand, on the pistol he was carrying before and after the murder, and on the parking brake handle of the petitioner car;

—microscopic and chemical analysis indicated that the fragments found on petitioner's allegedly "new and unused" wire cutters matched the composition of the cut phone wires at the victim's condominium;

—a hair sample from petitioner matched one found at the crime scene;

—petitioner had a master key to the victim's condominium;

—a bystander at the crime scene testified that petitioner had told him that the victim had been killed at a time that the petitioner claims he had not yet become aware of the murder.

12. To be sure, questions have been raised concerning the reliability of dog scent evidence. See Andrew E. Taslitz, *Does the Cold Nose Know?* *The Unscientific Myth of the Dog Scent Lineup,* 42 Hastings L.J. 17 (1990).

Petitioner testified in his own defense. He denied killing the victim, gave an alternative account of his whereabouts on the night of the murder, and explained the occult blood as resulting from horseplay with his dogs and children. He also denied admitting his guilt to the two prisoners who testified. He did not, however, explain why his wire cutters contained fragments matching those of the cut telephone wires, why the police dog followed his scent to the crime scene, or deny or explain the other three alleged admissions.

During the course of the trial, the prosecutor referred to petitioner as "the man sitting in this wooden enclosure," and the judge instructed the jury that "[w]here the defendant sits is a matter of custom like so many other things, [and] has no consequence." *Moore*, 379 Mass. at 108, 393 N.E.2d 904.

In *Young*, the court held that "[t]he prisoner's dock, like other physical restraints, should ... be employed only when the trial judge has found such restraint reasonably necessary to maintain order and when cured by an instruction to the jurors that such restraint is not to be considered in assessing the proof and determining guilt." 700 F.2d at 36–37 (quoting ABA Standards for Criminal Justice § 4.1(c) (1980)). In petitioner's case, the trial judge did offer a curative instruction, but it is unclear whether he found that the use of the dock was necessary to maintain order. An implication to that effect can be made from the colloquy reproduced above, and in particular the trial judge's statement that he would consult with the Sheriff, and had given the matter "considerable consideration." Nonetheless, the judge's failure to provide explicit justification is disturbing, since it impedes meaningful appellate (or collateral) review of his decision. However, notwithstanding any uncertainty about whether the use of the dock was justified in this case, I conclude that relief is not warranted because the error, if any, was harmless.

### 4. Standard of Review under Brecht v. Abrahamson

In *Young*, the Court of Appeals, after determining that the use of the prisoner's dock was a constitutional violation, applied a "harmless beyond a reasonable doubt" standard of review. *See Estelle v. Williams*, 425 U.S. at 506–508, 96 S.Ct. at 1694–1695; *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Finding that the constitutional error was not harmless beyond a reasonable doubt, it granted petitioner relief. 700 F.2d at 37.

Since *Young* was decided, the Supreme Court has dramatically reworked the harmless error standard applicable in habeas cases. In *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Court distinguished between two general types of constitutional errors. "Structural errors" are errors which "infect the entire trial process" and require automatic reversal. *Brecht*, 507 U.S. at 628–630, 113 S.Ct. at 1717. *See also Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (structural error "affect[ ] the framework in which the trial proceeds"). Structural errors, for example denial of the right to counsel, are relatively rare. The majority of constitutional errors, however, are not structural, but "trial" errors. These errors occur during the presentation of the case to the jury, and are amenable to harmless error analysis.[13] *Brecht*, 507 U.S. at 628–629, 113 S.Ct. at 1717.

*Brecht* changed the standard for reviewing "trial" type errors. Prior to *Brecht*, most courts, including the court in *Young*, had applied the "harmless beyond a reasonable doubt" standard. That standard was held applicable in direct appeals in *Chapman v. California, supra*, and most habeas court had applied it as well. In *Brecht*, however, the Court held that a "trial" type error merits collateral relief only if, upon review of the entire record, the court concludes that it had a "substantial and injurious effect or influence in determining the jury's verdict."

---

13. In *Brecht*, the Court alluded to an intermediate category of error, a "deliberate and especially egregious error of the trial type, or one that is so combined with a pattern of prosecutorial conduct [as to] infect the integrity of the proceeding." 507 U.S. at 637–639, n. 9, 113 S.Ct. at 1722, n. 9. Such an error might warrant habeas relief even if it did not substantially influence the jury's verdict. *Id.* Such error is obviously not present here.

*Brecht,* 507 U.S. at 630–631, 637–639, 113 S.Ct. at 1718, 1722. The burden of proving harmlessness remains, however, with the government. *Gilday v. Callahan,* 59 F.3d 257, 268, n. 11 (1st Cir.1995); *Brecht,* 507 U.S. at 639–641, 113 S.Ct. at 1723 (Stevens, J., concurring).

Simple logic dictates that the error here, if any, cannot be of the structural type. Even under *Young,* use of the prisoner's dock is permissible under those circumstance where a security need is demonstrated and a curative instruction is given. It follows that, given adequate prophylactic measures, use of the dock is not so damaging to the possibility of a fair trial as to make harmless error review impossible. *See Young,* 700 F.2d at 37 (applying harmless error review, and stating that "[w]e do not announce a per se rule."). I therefore conclude that the error here, if any, was a trial type error, and requires reversal only if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 631, 637, 113 S.Ct. at 1718, 1722.

5. *Whether Use of the Prisoner's Dock had a Substantial and Injurious Effect or Influence in Determining the Jury's Verdict*

Having engaged in a de novo review the entire trial record, *see Brecht,* 507 U.S. at 641–643, 113 S.Ct. at 1724 (Stevens, J., concurring), I conclude that the error here, if any, did not have a "substantial and injurious effect or influence in determining the jury's verdict" within the meaning of *Brecht.* In making this determination, I have considered the following factors: "(1) the extent to which the error permeated the proceeding, (2) the centrality of the issue affected by the error to the case as actually tried and (3) the relative strength of the properly admitted evidence of guilt." *Levasseur v. Pepe,* 70 F.3d 187, 193 (1st Cir.1995).

In *Young,* the court premised its grant of habeas relief on two primary grounds. First, the trial judge had not issued a curative instruction, thus permitting whatever prejudice may have resulted from use of the dock to have its fullest impact. 700 F.2d at 37. By contrast, the judge in this case specifically instructed the jury that the defendant's placement in the prisoner's dock was merely traditional, and of no consequence.

Second, the *Young* Court apparently perceived the case against the defendant as being less than compelling. The Court noted that an earlier trial had ended in a hung jury, and that the jury ended up returning a second degree murder verdict even though the, under the prosecutor's theory of the case, the murders could only have been in the first degree. 700 F.2d at 37. The Court concluded that, in light of these facts, "[a]ny suggestion that appellant was a dangerous person, implanted in the minds of the jurors through observation of appellant confined in the dock day after day, may have tipped the scales of justice." *Id.*

By contrast, the government's evidence against petitioner was highly compelling. Five independent witnesses recounted petitioner's admissions that he committed the crime. These witnesses included petitioner's close friend and drinking companion, his neighbor, a policeman, and two fellow prisoners from an unrelated period of incarceration. The jury needed only to believe one to reach a guilty verdict.

Moreover, significant amounts of circumstantial and physical evidence placed petitioner at the crime scene, and provided a motive for the crime. The victim was killed sometime after midnight, and the petitioner admitted being near the crime scene on the night of the murder at approximately 2:00 a.m. Metal fragments taken from petitioner's wire cutters matched telephone wires which had been cut at the victim's apartment. A trained dog detected petitioner's scent at the crime scene. A bystander at the crime scene testified that petitioner had told him that the victim had been killed at a time that the petitioner claims he had not yet become aware of the murder.

Finally, petitioner had a motive to commit the murder. The victim was a young man and son of the owner of the construction site where petitioner worked. There is ample evidence that petitioner resented the victim's inherited wealth, and being bossed around by someone he considered a young upstart (petitioner was in his 40s at the time of the

murder). More significantly, there was evidence that the victim had recently discovered that petitioner had been stealing appliances from the job site, and had been billing the company for bogus overtime.

All of this evidence paints an overwhelming picture of petitioner's guilt of the crime. Given that petitioner exercised his right to testify on his own behalf, any impression the jury may have gotten of the petitioner is likely to have been far more the result of that testimony (and the government's introduction of evidence of petitioner's numerous prior criminal convictions, and evidence that he had been in a federal prison on an unrelated offense only a year before the trial) than of speculation about the significance of his presence in the prisoner's dock. In light of all these considerations, I conclude that the error of using the prisoner's dock, in any, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 630–631, 637–639, 113 S.Ct. at 1718, 1722. Accordingly, the petitioners' request for relief on this ground must be **DENIED.**

## III. *REMAINING COUNTS*

The remaining counts in the petition were earlier dismissed by Judge Keeton because he found that they had been rejected by the state courts on an adequate and independent state law ground, namely petitioner's failure to raise contemporaneous objections at trial, and because petitioner had not shown cause for his procedural failure and actual prejudice deriving from the alleged violation of federal law. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2564–2565, 115 L.Ed.2d 640 (1991). Judge Keeton issued this ruling before he appointed counsel to represent petitioner. Now represented by counsel, petitioner seeks reconsideration of that ruling.

### A. *Whether the State Courts Considered Petitioner's Claims on the Merits*

Petitioner had argued to Judge Keeton that his claims were not barred because the last state court to consider his claims had not "clearly and expressly" rested its rejection of his claims on procedural grounds. *See Allen v. Commonwealth,* 926 F.2d 74, 78–79 (1st Cir.1991). Judge Keeton disagreed, and held that the denial, by a single justice of the Supreme Judicial Court, of leave for petitioner to appeal from the denial of his motion for a new trial under M.G.L. ch. 278 § 33E constituted a dismissal on procedural grounds, barring further habeas review. In particular, Judge Keeton held that because it did not "fairly appear" that the single justice's decision was based on federal law, her failure to make a "plain statement" that her decision was premised solely on state law grounds did not open the door to federal habeas review. *See Coleman v. Thompson,* 501 U.S. 722, 740, 111 S.Ct. 2546, 2559–2560, 115 L.Ed.2d 640 (1991). *See also McLaughlin v. Gabriel,* 726 F.2d 7, 8–9 (1st Cir.1984); *Storey v. Ponte,* 735 F.2d 626, 627–28 (1st Cir.1984).

In his motion for reconsideration, petitioner contends that this Court should not have looked to the decision of the single justice, which was an unexplained "gatekeeping" decision and not a decision on the merits, and instead should have examined the statements of the trial judge who rejected petitioner's new trial motion, to determine whether that judge rejected petitioner's claim on state law grounds. *See Ylst v. Nunnemaker,* 501 U.S. 797, 803–804 & n. 3, 111 S.Ct. 2590, 2594–2595, n. 3, 115 L.Ed.2d 706 (1991) (holding that when there has been one reasoned state court judgment rejecting petitioner's claim, later unexplained orders upholding that judgment should be assumed to rest on the same ground as the reasoned judgment).

The trial judge rejected petitioner's new trial motion with the following notation:

"Having examined the within motion and the memorandum and whereas it appears the grounds advanced were not such as would require an evidentiary hearing, and mostly were advanced or known but were not raised in any earlier proceeding and where it further appears that the grounds advanced are without merit, denied."

Relying on this language, petitioner claims that the trial judge rejected his federal claims on the merits, and that he is therefore entitled to habeas review.

This argument fails because its basic premise, that the SJC's ruling needs further explanation, is incorrect. *Ylst* only directs the habeas court to look to the decisions of a lower state court where a higher state court affirms the lower court's ruling without explanation. *Ylst*, 501 U.S. at 804, n. 3, 111 S.Ct. at 2595, n. 3. Here, the SJC's order was not unexplained, but specifically stated that petitioner's appeal was rejected because the issues raised in his motion for a new trial "are not new or substantial as we have defined that term." As the First Circuit held in *McLaughlin*, a rejection on such grounds is not a rejection on the merits, but evidences the Court's refusal to consider claims which the petitioner may not bring as of right under state law. *McLaughlin*, 726 F.2d at 9.

## B. *Petitioner's Sandstrom Claim*

### 1. *Whether Petitioner's Sandstrom Claim is Procedurally Barred*

■ Petitioner makes an additional argument against procedural bar with respect to Count 1 of his petition. Count 1 alleges that the jury instructions in petitioner's trial were defective because they impermissibly permitted the jury to presume an element of the offense in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). Petitioner contends that the Massachusetts contemporaneous objection rule does not bar this claim because the Massachusetts courts have not "strictly or regularly followed" it concerning *Sandstrom* type errors which occurred prior to the *Sandstrom* decision. *See Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988); *Dugger v. Adams*, 489 U.S. 401, 410, n. 6, 109 S.Ct. 1211, 1217, n. 6, 103 L.Ed.2d 435 (1989); *Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995) (procedural requirement must be "consistently applied" to bar habeas review).

The First Circuit has concluded, and my own research confirms, that Massachusetts courts waive the contemporaneous objection rule when reviewing *Sandstrom* type errors which occurred prior to the *Sandstrom* decision. *See Libby v. Duval*, 19 F.3d 733, 735, n. 5 (1st Cir.1994) *cert. denied*, —— U.S. ——, 115 S.Ct. 314, 130 L.Ed.2d 277 (1994); *DeJoinville v. Commonwealth*, 381 Mass. 246, 250–251, 408 N.E.2d 1353 (1980); *Commonwealth v. Repoza*, 400 Mass. 516, 520, 510 N.E.2d 755 (1987); *Commonwealth v. Sires*, 405 Mass. 598, 600, n. 2, 542 N.E.2d 580 (1989). Since petitioner's *Sandstrom* claim falls within this exception, I find that it is not barred by an adequate and independent state law ground and may be considered by this Court.

### 2. *Whether Petitioner's Sandstrom Claim is Meritorious*

■ Having concluded that petitioner's *Sandstrom* claim is not procedurally barred, I nonetheless find it lacking on the merits. *Sandstrom* held that it was constitutional error to permit a jury to presume the existence of an element of an offense. 442 U.S. at 521, 99 S.Ct. at 2458. The jury instructions in petitioner's case would appear to violate that rule. The trial judge instructed the jury that "[w]here the fact of killing is known and there are no circumstances to disclosed [sic] tending to show justification or excuse, there is nothing to rebut the natural presumption of malice." This instruction appears similar to, and constitutionally indistinguishable from, the rejected instruction in *Sandstrom*.[14]

However, even if the instruction was in error, petitioner's conviction will not be reversed if a review of the whole trial record reveals that the error was harmless. *See Libby v. Duval*, 19 F.3d at 739–40; *Anderson v. Butler*, 23 F.3d 593, 597 (1st Cir.1994); *LeBlanc v. Duval*, 900 F.Supp. 538, 544 (D.Mass.1995). In particular, unless the purported error had a "substantial or injurious effect or influence in determining the jury's verdict" it will not result in a reversal. *Brecht*, 507 U.S. at 630–631, 637–639, 113 S.Ct. at 1718, 1722.

Upon reviewing the trial record, I conclude that the challenged instruction did not have a substantial and injurious effect or influence in determining the jury's verdict. The issue

---

**14.** The *Sandstrom* jury was instructed that "the law presumes that a person intends the ordinary consequences of his voluntary acts." *Sandstrom*, 442 U.S. at 513, 99 S.Ct. at 2453.

of malice was never raised and was never seriously at issue in this trial. The victim, according to the testimony of the forensic pathologist who examined him, was bludgeoned to death with a blunt object to the head. The pathologist found evidence of at least four blows of tremendous force. The circumstances strongly suggested that the victim was killed in his sleep.

Thus the evidence of malice at trial was overwhelming. It was clear that whoever killed the victim did so with malice, and the only real issue at trial was the identity of the killer. *Compare Sandstrom*, 442 U.S. at 512, 99 S.Ct. at 2453 (defendant had admitted killing victim, but claimed he lacked the requisite intent to commit "deliberate homicide"). The jury concluded that petitioner was the killer; I cannot see how the erroneous instruction could have influenced that determination.

### C. *Petitioner's Reasonable Doubt Claim*

■ Finally, Petitioner contends that this Court should reconsider its dismissal of Count 2 of his petition, which alleges that the trial judge's instructions to the jury impermissibly diluted the government's burden of proof beyond a reasonable doubt. *See Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Petitioner failed to raise this issue at trial, but contends that, as with *Sandstrom* type claims, Massachusetts does not regularly enforce the contemporaneous objection rule in such circumstances.

In support of his proposition that the Massachusetts contemporaneous objection rule does not bar his claim, petitioner cites to a number of cases in which the Supreme Judicial Court has waived the contemporaneous objection rule. *See Commonwealth v. Gagliardi*, 418 Mass. 562, 568, 638 N.E.2d 20 (1994) *cert. denied*, —— U.S. ——, 115 S.Ct. 753, 130 L.Ed.2d 652 (1995); *DeJoinville v. Commonwealth*, 381 Mass. 246, 408 N.E.2d 1353 (1980); *Connolly v. Commonwealth*, 377

Mass. 527, 387 N.E.2d 519 (1979); *Commonwealth v. Collins*, 374 Mass. 596, 373 N.E.2d 969 (1978); *Commonwealth v. Stokes*, 374 Mass. 583, 374 N.E.2d 87 (1978).

Only one of the cited cases, *Gagliardi*, concerns a challenge to a reasonable doubt instruction. In that case, Gagliardi appealed from the trial court's denial of his motion for a new trial raising as a ground an allegedly improper reasonable doubt instruction. The Supreme Judicial Court chose not to apply the contemporaneous objection rule in that instance because "if, as the defendant argues, the instruction on reasonable doubt given at his trial was constitutionally deficient in that it permitted the jury to convict the defendant on proof less than proof beyond a reasonable doubt, a substantial miscarriage of justice very likely would result." 418 Mass. at 568, 638 N.E.2d 20.

The Court went on to review, and reject, Gagliardi's challenge to the instructions at issue. It thus appears that the sole reason that the Court agreed to waive the contemporaneous object rule was because of the type of claim involved, rather than the specific facts of the case. The SJC appears to state in *Gagliardi* that it will waive the contemporaneous objection rule in cases challenging the sufficiency of reasonable doubt instructions because such cases, by their nature, raise the possibility of a substantial miscarriage of justice. *Id.* I therefore find that Massachusetts courts do not consistently apply the contemporaneous objection rule against challenges to faulty reasonable doubt instructions, and petitioner's claim should be heard on the merits.[15]

■ In reviewing a challenged reasonable doubt instruction, this Court must determine whether the instruction created "a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor v. Nebraska*, 511 U.S. 1, ——, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994).

---

**15.** Alternatively, I find, as did the Massachusetts Supreme Judicial Court in *Gagliardi*, 418 Mass. at 568, 638 N.E.2d 20, that the failure to consider a potentially meritorious challenge to a reasonable doubt instruction creates a substantial likelihood of a miscarriage of justice. Such a

likelihood is a sufficient ground for excusing petitioner's failure to raise a contemporaneous objection to the instruction at trial. *Coleman v. Thompson*, 501 U.S. 722, 749, 111 S.Ct. 2546, 2564, 115 L.Ed.2d 640 (1991); *Levasseur v. Pepe*, 70 F.3d 187, 192 (1st Cir.1995).

If I find that the reasonable doubt instruction was so lacking, the error would be a "structural" one, and harmless error analysis would be inapplicable. *Sullivan v. Louisiana,* 508 U.S. 275, 279–283, 113 S.Ct. 2078, 2082–2083, 124 L.Ed.2d 182 (1993). Under such circumstances, petitioner would be entitled to a new trial.

I am not prepared to decide this issue based on the pleadings before me. The issue is a close one,[16] and the parties have only briefed petitioner's motion for reconsideration of Judge Keeton's dismissal on procedural bar grounds, rather than the merits of this claim. Accordingly, I will reserve decision on this final issue pending further briefing by the parties.

## IV. *CONCLUSION*

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** with respect to Count 4. Petitioner's motion for reconsideration of Judge Keeton's dismissal of the remaining counts is **DENIED** except as to Counts 1 and 2, for which it is **ALLOWED.** Count 1 is **DISMISSED** for the reasons stated in this decision. Decision with respect to Count 2 is **RESERVED** pending further briefing by the parties. Petitioner is hereby **ORDERED** to submit a memorandum of law in support of Count 2 of the petition no later than June 21, 1996. Respondent will file an opposition no later than July 22, 1996.

**SO ORDERED.**

---

16. The trial judge's instructions included the following language: "Reasonable doubt is sometimes said to be a doubt for which a good reason can be given. Now proof beyond a reasonable doubt means proof to a moral certainty. A juror may be said to be morally certain when he is so fully convinced that he would act on his conviction in matters of highest importance concerning his own affairs." Similar language has been criticized as potentially misleading. *See United States v. Colon–Pagan,* 1 F.3d 80, 81 (1st Cir. 1993); *U.S. v. Noone,* 913 F.2d 20, 29 (1st Cir. 1990) *cert. denied,* 500 U.S. 906, 111 S.Ct. 1686, 114 L.Ed.2d 81 (1991). *But see Robinson v. Callahan,* 694 F.2d 6, 7 (1st Cir.1982).

The ultimate inquiry though, is not as to whether particular words or phrases were present in the instruction, but whether the instruction as a whole made it reasonably likely that the jury applied an incorrect standard. *Victor,* 511 U.S. at ——, 114 S.Ct. at 1243.